[No. F013671. Fifth Dist. Mar. 6, 1992.]

HORSEMEN'S BENEVOLENT & PROTECTIVE ASSOCIATION,
Plaintiff, Cross-defendant and Respondent, v.
VALLEY RACING ASSOCIATION et al., Defendants, Cross-complainants
and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication. Those portions directed to be published follow.

1540

1542

1544

## Counsel

Kahn, Soares & Conway, Leonard Herr, Brian L. McCabe and Steven D. Huff for Defendants, Cross-complainants and Appellants.

Boone & Betaque, William B. Boone, DeMeo & DeMeo, John F. DeMeo and Donald C. Thuesen for Plaintiff, Cross-defendant and Respondent.

## Opinion

**BUCKLEY, J.**—In August 1987, respondent Horsemen's Benevolent & Protective Association (HBPA) filed a complaint for damages arising from breach of a written purse agreement. Thereafter, appellant Valley Racing Association (VRA), a partnership, filed a cross-complaint for breach of contract, interference with business advantage, defamation and open account stated.

After jury trial, a special verdict was rendered by the jury concluding that VRA had breached the purse agreement with HBPA. Judgment was entered on the verdict for HBPA in the sum of $188,960 with interest of $67,710, a total of $256,670. VRA appeals from the judgment.

### Statement of Facts

This litigation stems from a written purse agreement between HBPA and VRA concerning the 1986 mixed breed spring horse racing meet in Fresno. In 1986, HBPA was a national corporation, incorporated in Kentucky and authorized to conduct business in California. VRA was a partnership which

conducted mixed breed horse racing at the Fresno Fair Grounds from 1981 through 1986. The individual defendants (Sawtelle, Al Foote, Valov, Yurosek, Wilkinson and McCarthy) were the partners in VRA.

Wagering at the 1986 mixed breed meet was pursuant to the pari-mutuel system. Wagers are placed with the track which is the stakeholder. Following the race, the stakeholder redistributes that money to the winners of the races and other entities as specified by statute. The "handle" is the pari-mutuel pool, or the gross amount wagered through the Totalizator machines. "Purses" are that portion of wagers distributed to the first five finishers of the race. Generally, approximately 85 percent of the pool is paid to the winning bettors and the other 15 percent (commonly referred to as the "take out") is divided among the state as license fees, the horseowners as purses and the racetrack as commissions.

The parties entered into a written agreement to govern the 1986 mixed meet in Fresno. In article II, section 2.1 under the heading of "DISTRIBUTION OF PARIMUTUEL TAKEOUT: PAYMENT TO HBPA," the contract provides as follows:

"Pursuant to the Horse Racing Law, Section 19612.6(c), TRACK[1] shall pay a State license fee as provided in Section 19612.6(b). The amount remaining after deduction of the State license fee shall be distributed equally between commissions and purses. The amount to be distributed as purses for the 1986 race meet shall be based on thoroughbred pari-mutuel pools during the 1985 race meet."

The contract provided that all sums due HBPA would be paid by "TRACK" within 10 days after the close of the 1986 meet.

The contract also contained a provision dealing with an overpayment that was made to HBPA in 1985. The contract stated:

"TRACK and HBPA agree that Sixty Four Thousand Dollars ($64,000) representing an overpayment during TRACK's 1985 race meet shall be subtracted from what would otherwise be available for purses during TRACK's 1986 race meet."

In article IV, it was agreed between the parties that the minimum purse for an overnight race conducted during the term of the agreement could not be less than $2,000 and could not be lowered without the prior written approval

---

[1]In the agreement, VRA is referred to as "TRACK."

of HBPA.[2] The contract also contained a provision whereby VRA would pay 3 percent of the gross distribution to HBPA for the following purposes: 1 percent for administrative expenses and services rendered to horsemen, 1 percent for welfare funds and 1 percent for a pension program for backstretch personnel to be administered by HBPA.

The basic purse structure (based on pari-mutuel pools for the prior year) in this contract reflects the custom in the horse racing industry for approximately the prior 20 years.

Purses paid by VRA to thoroughbred horsemen in 1985 totaled $784,900. Under the interpretation urged by HBPA, applying the formula in the purse agreement to the 1985 handle would produce thoroughbred purses for 1986 of $619,883. This figure is arrived at after taking the net distribution for 1985 at $704,964, reducing that number by 3 percent to be paid to HBPA ($21,081), which left $683,883 available for 1986 purses. However, after deducting the overpayment from the prior year in the amount of $64,000, the figure reached was $619,883. Before the 1986 contract was signed, Don Johnson, the director of HBPA in 1986, explained these calculations to VRA partner Sawtelle by telephone and set out the figures in a confirming letter. Sawtelle told Charles Palmer, VRA's racing secretary, that VRA had $600,000 to use for thoroughbred purses. As racing secretary, Charles Palmer put together a "condition book," a document which advises participating horsemen of the type of meet, the level of purses and the kind of races that will be run at the meet. Palmer used the $600,000 figure when he prepared the condition book. The condition book prepared by Palmer was for the first 14 days of the meet and contained the following statement, the "Valley Racing Association reserves the right to review and revise the Purse Schedule after the first four (4) days." The condition book was distributed to owners, trainers and breed associations in advance of the meet.[3]

Horseracing in California is governed by the California Horse Racing Board (CHRB or board). To conduct a horse racing meet in California, an applicant must submit an application to the CHRB for approval. As part of the application process, the CHRB requires information to be submitted on the purses that will be paid. The CHRB monitors the progress of the meet to assure proper distribution of wagers, collection of license fees and all distributions required by statute.

---

[2] An overnight race is a nonstakes race. A stake race requires entrants pay a nomination fee to participate.

[3] HBPA witness Don Johnson explained this clause was to give VRA flexibility when races do not fill, are cancelled and purses must be redistributed to other races.

Leonard Foote, executive secretary of the CHRB and the brother of Al Foote, a partner in VRA, testified that the board will take action if purses are significantly higher or lower than the handle being generated at the current meet. The CHRB will contact the race operator and tell the operator to make adjustments to purses. The objective of this practice is to make sure that overpayments or underpayments of purses are minimal.

In the 1986 meet, purses generated by the pari-mutuel handle (wagers) were substantially less than those generated in 1985.

After receiving daily reports on the handle of the 1986 meet, John Reagan, the Totalizator systems examiner for the CHRB, became concerned. He called Sawtelle, discussed the handle and told him adjustments would have to be made. After several conversations with Sawtelle, he went to Leonard Foote and asked him to let Sawtelle know that he (Reagan) was acting on behalf of the CHRB.

After Reagan contacted Leonard Foote and told him he was getting no cooperation regarding the cutting of purses, Leonard Foote testified he called Everett Nevin, the director of racing of the VRA, and directed him to cut purses for the 1986 meet.[4] He also called his brother Al Foote and asked him, "What in the hell is happening with purses?" Leonard Foote did not confer with any CHRB commissioner before he instructed Nevin to cut the purses. He took this action based on his personal opinion of what had to be done; he did not know the opinion of the CHRB.

Reagan testified it was his understanding it was within his power to order purses reduced. He did not speak to any CHRB commissioner prior to his direction to cut purses nor did he seek approval of the board as a whole. He did not recall reporting to the CHRB his action regarding cutting purses and did not agenda any hearing before the CHRB.

Al Foote and Sawtelle of VRA verbally instructed Charles Palmer, VRA racing secretary, to cut purses before the end of the first 14 days of the meet. He was also instructed to cut them below the $2,000 minimum. Palmer initially was reluctant to cut purses and had to be directed again to cut them. No permission was given by HBPA to cut purses. After purses were reduced, Charles Dougherty, the Northern California field representative for HBPA, protested the cutting of purses. There was never an agreement between the parties modifying the 1986 purse agreement.

[4]Nevin denied he was instructed to cut purses by Foote or any other official from the CHRB.

The total thoroughbred purse paid by VRA at the 1986 meet was $452,000. VRA also did not pay HBPA the 3 percent figure as required by section 2.5(a) of the purse agreement ($21,149). HBPA did not pay VRA the $64,000 overpayment in purses from the 1985 meet.

## DISCUSSION

We must begin our discussion of the issues presented by determining whether HBPA was statutorily precluded from filing its action in the Fresno County Superior Court. It is axiomatic that if it was, any judgment therefrom would be a nullity.

### *Standing*

Business and Professions Code[5] section 19613.2 provides:

"(a) Any horsemen's organization or organization representing horsemen shall be incorporated under the laws of the State of California in order to receive a distribution or deduction under this chapter. Each corporation shall represent a majority of the horsemen in the state with respect to the breed of horses the corporation represents. The board shall initially determine the organization which represents California horsemen with respect to each breed. Any distribution or deduction received by any of those organizations shall be used only for the benefit of California horsemen.

"(b) Notwithstanding subdivision (a), any organization incorporated in the state other than California is exempt from the requirements of subdivision (a) until January 1, 1991, if all of the following conditions exist:

"(1) All of the members of the board of directors of the organization are residents of the State of California.

"(2) No funds of the organization other than nominal dues or incidental amounts have been paid to an out-of-state organization during the previous five years.

"(3) The organization has no obligation to any out-of-state organization requiring it to make payments of any kind other than voluntary payments."

Both parties address this issue as one of "standing." Although not determinative of our resolution of this issue, we would be remiss if we did not

---

[5]All statutory references are to the Business and Professions Code unless otherwise indicated.

point out that the issue is not one of standing but rather one of capacity to sue[6] (i.e., is HBPA barred by § 19613.2 from effecting distribution).

In any event, we conclude that section 19613.2 is inapplicable here. That section was given an effective date of July 10, 1987. The cause of action, however, accrued no later than June 1, 1986, the last day of the race meet. A cause of action ordinarily accrues when the act or omission (nonpayment) is done and the obligation or liability arises. It is at that point that suit may be brought on the obligation. (Cf. *Irvine* v. *Bossen* (1944) 25 Cal.2d 652, 658 [155 P.2d 9].)

VRA, pointing to the fact that the action was *filed after* the effective date of section 19613.2, contends that the statute is merely procedural and therefore may be applied to pending proceedings without violating the general rule of the nonretroactive application of statutes. VRA cites *Alto Loma School Dist.* v. *San Bernardino County Com. on School Dist. Reorganization* (1981) 124 Cal.App.3d 542 [177 Cal.Rptr. 506], *Olivas* v. *Weiner* (1954) 127 Cal.App.2d 597 [274 P.2d 476] and *Governing Board* v. *Commission on Professional Competence* (1977) 72 Cal.App.3d 447 [140 Cal.Rptr. 206].

While we do not question the general premise of law argued by VRA and the applicability of the cases cited to *that* general premise, we disagree on a more fundamental basis. We perceive the statute as effecting a *substantive* change in the law, rather than a *procedural* one.

Section 19613.2 effectively disenfranchises all but the corporations prescribed therein from effecting distribution under the chapter, impliedly barring those corporations from the California court system. As applied here, rather than "providing a new remedy for the enforcement of existing rights" (*Governing Board* v. *Commission on Professional Competence, supra,* 72 Cal.App.3d at p. 461) section 19613.2 purports to *take away* rights (to receive distribution) which were already existing. (Cf. *Aetna Cas. & Surety Co.* v. *Ind. Acc. Com.* (1947) 30 Cal.2d 388, 395 [182 P.2d 159].)

In a case involving the constitutionality of a law having application to instruments (notes and deeds of trust) executed before its effective date, our Supreme Court stated the general rule:

---

[6]Typically the issue of "standing" arises when one who invokes the judicial process does not have a real interest in the ultimate adjudication because the actor has not suffered or is not about to suffer injury. (*California Water & Telephone Co.* v. *County of Los Angeles* (1967) 253 Cal.App.2d 16, 23 [61 Cal.Rptr. 618].) Clearly, HBPA has a significant interest in these proceedings. The distinction often can be significant inasmuch as pleas in abatement, such as lack of capacity to sue, must be raised by answer or demurrer, or are waived. (*Danziger* v. *Peebler* (1948) 88 Cal.App.2d 307, 310 [198 P.2d 719].) Standing, however, is not waived by failure to timely object. (*Parker* v. *Bowron* (1953) 40 Cal.2d 344, 351 [254 P.2d 6].)

" ' "This court has said that 'the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge and enforcement. . . . Nothing can be more material to the obligation than the means of enforcement. . . . The ideas of validity and remedy are inseparable, and both are parts of the obligation, which is guaranteed by the Constitution against invasion.' " ' " (*Brown* v. *Ferdon* (1936) 5 Cal.2d 226, 230 [54 P.2d 712].)

A statute affecting a substantive right will, if possible, be construed prospectively to avoid a declaration of unconstitutionality. (*Saso* v. *Furtado* (1951) 104 Cal.App.2d 759, 764 [232 P.2d 583].) Even a procedural statute which may validly be given a retroactive operation will ordinarily, for reasons of fairness, be construed as prospective, unless the legislative intent to make it retroactive clearly appears. (7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 495, pp. 685-686.)

■ This policy has been applied where a statute, though partially procedural in form, may be substantive in nature or effect. A contention was made in *Aetna Cas. & Surety Co.* v. *Ind. Acc. Com.*, *supra*, 30 Cal.2d 388, that there is no presumption against retroactive effect of statutes relating to remedies and modes of procedure. The court held that such an argument assumes a clear-cut distinction between purely procedural and purely substantive legislation. If substantial changes are made, even in a statute which might ordinarily be considered procedural, the operation on existing rights would be retroactive because the legal effects of past events would be changed, and the statute would be considered to operate only in the future unless the legislative intent to the contrary is clear. (*Id.* at p. 394.)

We hold the legislation here (§ 19613.2), which contains no language or inference of retroactivity, cannot be so applied to prevent redress to HBPA on accrued obligations.

### Exhaustion of Administrative Remedies

VRA next contends that HBPA, compelled by section 19440 et seq. to exhaust administrative remedies, was precluded from filing its complaint without first presenting the matter to the CHRB for its resolution.

We disagree. Section 19440 vests the CHRB with authority to adjudicate controversies arising from the enforcement of laws and regulations dealing with horse racing and pari-mutuel wagering. Section 19562 authorizes the

CHRB to prescribe rules, regulations and conditions under which all horse races with wagering on their results shall be conducted in California. Pursuant to that authority, the board has adopted sections 2042 and 2043 of title 4 of the California Code of Regulations. Section 2042 provides that any agreement, covenant or contract entered into by the acknowledged horsemen's organization with any licensed racing association is binding upon the racing association and its employees, agents, representatives and officials. Section 2043 states: "A complaint regarding any violation or alleged violation of any provision of an agreement between a horsemen's organization and a racing association may be filed with the Board by either of the contracting entities. The Board shall immediately investigate the allegations and may refer any such complaint to the Board of Stewards appointed for the meeting whereat the violation is alleged to have occurred, or refer the matter for hearing pursuant to the provisions of Section 1414. The Stewards or a Referee may, after hearing the matters alleged, order compliance with the terms of the contract *if within their authority to do so*, or propose to the Board a decision or other course of action including therein their recommendations to the Board." (Italics added.)

Section 1414 states:

"When directed by the Board, any one commissioner, the secretary, any hearing officer assigned by the Office of Administrative Hearings or any other qualified person may sit as referee for the taking of evidence in any matter pending before the Board; any such referee shall report to the Board outlining all findings and the Board shall determine the matter as if such evidence had been presented to the full Board."

■ The requirement of exhaustion of administrative remedies is founded on the theory that the administrative tribunal is created by law to adjudicate the issue sought to be presented to the court, and the issue is within its special jurisdiction. If a court allows a suit to go forward prior to a final administrative determination, it will be interfering with the subject matter of another tribunal. Therefore, the requirement of exhaustion is a jurisdictional prerequisite, not a matter of judicial discretion. (*California Aviation Council v. County of Amador* (1988) 200 Cal.App.3d 337, 340-341 [246 Cal.Rptr. 110].)

The mere possession by some official body of a continuing supervisory or investigatory power does not itself suffice to afford an administrative remedy unless the statute or regulation under which that power is exercised establishes clearly defined machinery for the submission, evaluation and

resolution of complaints by aggrieved parties. (*Rosenfield* v. *Malcolm* (1967) 65 Cal.2d 559, 566 [55 Cal.Rptr. 505, 421 P.2d 697].)

In *Youst* v. *Longo* (1987) 43 Cal.3d 64 [233 Cal.Rptr. 294, 729 P.2d 728, 85 A.L.R.4th 1025], the Supreme Court addressed the issue of whether a race horse owner is entitled to tort damages when the harness driver of another horse negligently or intentionally interferes with the owner's horse during a race, thereby preventing the owner from the chance of winning a particular cash prize. An issue raised in the case was whether the CHRB had jurisdiction to decide and enforce tort claims against licensees and nonlicensees of the board who unlawfully interfered with a horse race. The Court of Appeal concluded that three provisions vested the board with power to award tort recovery for economic loss. First, section 19440 provided that the board had all powers necessary and proper to enable it to carry out fully and effectually the purposes of the chapter. Second, section 1530 of title 4 of the California Code of Regulations provided that should any case occur which was not covered by the rules and regulations of the board or by other accepted rules of racing, it shall be determined by the stewards in conformity with justice and in the interest of racing. Third, section 1529 of title 4 of the California Code of Regulations provided that the stewards " 'may refer any matter within their jurisdiction to the Board when the penalty the stewards have jurisdiction to impose is insufficient . . . or for other good and sufficient cause, and they may order the suspension of the licensee pending further Order of the Board. In such event, the Board shall accept the matter for hearing and adjudication or such other action as the Board deems to be in the best interests of justice.' " (43 Cal.3d at p. 81.)

The Supreme Court noted that although these provisions vest the board with broad powers, such powers are *regulatory* in nature. The board was created in 1933 and the grant of broad power has remained essentially unchanged since that time. The preamble of the act provided that its purpose was to regulate, license, supervise and " 'provide *penalties* for the violation of the provisions of this act.' (Stats. 1933, ch. 769, p. 2046, italics added.)" (43 Cal.3d at p. 81.)

It was noted that nowhere in title 4 of the California Code of Regulations is the board given authority to award affirmative relief in the form of compensatory or punitive *tort* damages. The court concluded that the rules and regulations contained in the California Code of Regulations demonstrate the character of the board as a regulatory and disciplinary entity. The extensive regulations neither express nor imply any authority to award affirmative monetary relief. It was undisputed that the board had never

awarded such affirmative relief and that neither the horse racing law nor the board regulations specifically include damages as a form of relief afforded by the board. It was held that the jurisdiction of the board was confined to disciplinary and regulatory matters. (43 Cal.3d at pp. 82-83.)

Although the court expressly limited the application of its holding to awards for general tort damages (*Youst* v. *Longo, supra,* 43 Cal.3d at p. 82, fn. 15), the court's analysis is equally applicable to the case before us.

Without specific language or implied legislative intent granting the CHRB the authority to award damages in disputes such as presented here, we cannot judicially expand the jurisdiction of the CHRB to include awards of contract damages.[7]

Although the *Youst* court did not specifically discuss section 2043 of title 4 of the California Code of Regulations, we cannot divine from the language of section 2043 an intention that the board be given authority to award contract damages.[8] Paradoxically, section 2043 states in pertinent part that the stewards or a referee may order compliance with the terms of the contract "if within their authority to do so." This begs the question of whether such authority is extant.

In the end, we must fall back to the conclusion of *Youst,* i.e., the CHRB is a regulatory and disciplinary entity, without authority to award affirmative monetary relief. (*Youst, supra,* 43 Cal.3d at p. 82.)

Accordingly, HBPA was not compelled to exhaust administrative remedies.

*Did the trial court err in failing to interpret the term "based on" as a matter of law?*

At trial, the critical issue was the interpretation of the term "based on" contained in section 2.1 of the purse agreement. As previously noted, in pertinent part, section 2.1 provided that "The amount to be distributed as

---

[7]Compare *McHugh* v. *Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348 [261 Cal.Rptr. 318, 777 P.2d 91] wherein the Supreme Court upheld, in part, the constitutionality of a rent control charter amendment specifically providing for administrative adjudication of rent claims and commensurate awards of damages. *McHugh* distinguished *Youst* as holding that "the relevant *statutes* did not authorize awards of . . . compensatory . . . damages by the [CHRB] . . . ." (*Id.* at p. 360.)

[8]A more basic question is presented as to how the CHRB, which promulgates the rules contained in title 4, can create its own authority to award damages and then act thereon.

purses for the 1986 race meet shall be based on thoroughbred pari-mutuel pools during the 1985 race meet." VRA alleges that the trial court committed reversible error when it failed to interpret the term as a matter of law. VRA asserts that since the term is based on a statute, any uncertainty of the contract is derived entirely from the ambiguity of the statute and the trial court compounded its error by erroneously allowing extrinsic evidence from HBPA regarding the meaning of "based on." Finally, VRA contends the extrinsic evidence admitted was not in conflict; therefore, the appellate court should interpret the meaning of the term "based on" as a matter of law.

HBPA responds that VRA joined in submitting contract interpretation issues to the jury and hence the rule of invited error applies. HBPA alleges VRA's counsel's conduct during the trial manifested agreement that interpretation issues be submitted to the jury, and, thus, VRA is estopped to claim error in this matter. Irrespective of invited error, HBPA asserts extrinsic evidence presented at trial gave rise to fact questions that were properly decided by the jury.

### Invited Error

Where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal. This application of the estoppel principle is generally known as the doctrine of invited error. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 301, p. 313.)

If an appellant offers inadmissible matters into evidence, he cannot complain of its admission on appeal. (9 Witkin, Cal. Procedure, *supra*, Appeal, § 302, pp. 313-314; *Gjurich* v. *Fieg* (1913) 164 Cal. 429, 433 [129 P. 464].) Likewise, an appellant cannot complain of an erroneous instruction where he requested the instruction given or one substantially similar to it. (9 Witkin, Cal. Procedure, *supra*, § 302, p. 314; *Collins* v. *Graves* (1936) 17 Cal.App.2d 288, 297 [61 P.2d 1198].) An appellant cannot submit a matter for determination by the lower court and then contend on appeal that the matter was beyond the scope of the issues. (9 Witkin, Cal. Procedure, *supra*, § 302, p. 314; *Estate of Armstrong* (1966) 241 Cal.App.2d 1, 7 [50 Cal.Rptr. 339].)

However, no estoppel results from acts of the appellant which are defensive or precautionary. When an appellant offers instructions on irrelevant matter only after an unsuccessful attempt to remove it from the case, he may attack the relevancy on appeal. (9 Witkin, Cal. Procedure, *supra*, Appeal, § 304, p. 315; *Williamson* v. *Pacific Greyhound Lines* (1949) 93 Cal.App.2d 484, 487 [209 P.2d 146].) In *Williamson*, the appellant requested the court to instruct the jury that there was no evidence to support the theory of contributory negligence. However, the court declined to do so and the appellant

submitted instructions on contributory negligence. The court ruled it could hardly be said the appellant invited the instructions when she did everything within her power in the opposite direction by seeking the withdrawal of the entire question from the jury. The appellant's instructions on contributory negligence therefore were purely defensive, tendered provisionally to be used only in case the court refused her withdrawal instruction. (93 Cal.App.2d at p. 488.)

In *Electronic Equipment Express, Inc.* v. *Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834 [176 Cal.Rptr. 239], the jury asked the court during deliberations for a definition of the word "appreciable" used in a special verdict question. The court specifically asked appellant's counsel whether he objected to the definition he intended to give. Appellant's counsel answered, "No, I guess not." On appeal the appellants contended that the definition of the term "appreciable" may have misled the jury. The court held that any objection to the court's definition of the term had been waived by appellant's acquiescence in the court's definition. (*Id.* at pp. 856-857.) The court noted there was authority that no waiver is found when a party alleging error has strenuously objected and then acted defensively to lessen the impact of the error. The appellants did not formally make an objection except to offer an alternative definition, and they ultimately and expressly stated they had no objection to the court's definition. The error was waived. (*Id.* at p. 857.)

 Review of the trial record makes it abundantly clear that VRA's counsel's actions did not constitute a waiver to assert error on appeal. While he did submit several instructions regarding the interpretation of contracts, none of the proposed instructions related to the interpretation of the critical term "based on."

During deliberations, the jury asked the court for a definition of the term "based on." Upon receipt of the jury inquiry, the court indicated to counsel it intended to define the word "base" or "based on" for the jury and then invited comments on the definition from counsel for the parties. After discussion with counsel, the court gave the following instruction to the jury:

" 'Bases' is a synonym for 'base.' The base or base of the thing is the point at which something else is established or constructed.

"With regard to the term 'based on.'

" 'The ordinary meaning of the words "based on" is an initial or starting point for calculation.' "

Previously at trial, counsel had argued that the court must define the term "based on," which he believed meant "estimate." In a lengthy colloquy

between counsel and the court, the court concluded by stating that there "isn't an ambiguity to be interpreted either way, . . . that's why we're here before the jury instead of having this decided as a matter of law."

The fact that, after initial objection to the direct testimony of witnesses relating to the interpretation of the term "based on," counsel cross-examined those same witnesses on the issue in no way constituted invited error. *Cross-examination* in that context was by definition, defensive.

Moreover, after the presentation of witnesses for HBPA, any questions regarding the term "based on" asked of VRA's witnesses on direct examination would not be invited error. Once it became clear the issue of the interpretation of the term in question was to be submitted to the jury and objections contrary thereto were unavailing, VRA was not precluded from meeting the proof offered by HBPA. (*De Roulet* v. *Mitchel* (1945) 70 Cal.App.2d 120, 125 [160 P.2d 574].)

"Neither is [VRA] estopped from urging the error on appeal. It is the duty of any litigant in the course of trial to submit to the rulings with reference to the proof of the issues, and after he has done so he may thereafter on appeal demonstrate the error of the ruling to which he made timely objection." (70 Cal.App.2d at p. 125.)

*Interpretation of the Term "Based On"*

This issue presents a conundrum which, upon apparent solution by the utilization of one approach, posits a new question in another respect. We now address this hydra.

In pertinent part, provisions of section 19613, subdivision (d) and section 2.1 of the contract are similar and both incorporate the term "based on."[9]

The gist of VRA's argument is that since the contractual provision concerning purse distribution is similar to the statutory provision for purse distribution, we are really dealing with the interpretation of a statute, a matter of law, rather than the intent of the parties to a contract, a factual issue.

---

[9]Former section 19613, subdivision (d), in part, states: "The amount to be distributed as purses or commissions for any race meet under this subdivision shall be based on respective parimutuel pools during the previous corresponding meeting, if any." Present section 19613, subdivision (d) omits reference to the words "based on."

Section 2.1, in part, states: "The amount to be distributed as purses for the 1986 race meet shall be based on thoroughbred pari-mutuel pools during the 1985 race meet."

From this argument, we perceive a more critical question: were the parties at liberty to enter into a contract which varies from the provisions of section 19613, subdivision (d)? The answer to this question depends upon whether the provision is directory or mandatory. (Cf. *Carter* v. *Seaboard Finance Co.* (1949) 33 Cal.2d 564, 573 [203 P.2d 758].) ■ While we acknowledge the use of the imperative word "shall" in the statute, the mere use of the word is not determinative. The word "shall" in a statute may sometimes be directory only, whereas the word "may," seemingly much less forceful, may be mandatory. (*Ibid.*)

■ Generally, whether a particular statute is intended to impose a particular duty is a question of interpretation for the courts. (*Nunn* v. *State of California* (1984) 35 Cal.3d 616, 624 [200 Cal.Rptr. 440, 677 P.2d 846].) It is well established that statutes must be given a reasonable construction that conforms to the apparent purpose and intention of the lawmakers. (*Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 813 [114 Cal.Rptr. 577, 523 P.2d 617].) In the interpretation of a statute, we are constrained to give effect and meaning to each part of the statute. (7 Witkin, Summary of Cal. Law (9th ed. 1988) § 94, pp. 146-147.)

Having so stated the general principles of statutory interpretation, we must look to the term "based on" and counsel's respective arguments. VRA contends the term refers to an "estimate"; HBPA contends that it means "equal to."

We perceive a major problem in adopting the interpretation urged by VRA. If the term "based on" means "estimate" and a contract were drafted in reliance upon that construction of the term, the contract may be nugatory. ■ It is generally held that where an essential element of the contract (e.g., purse share) is held open for future agreement, the contract is unenforceable until future agreement is reached. (Cf. *Ablett* v. *Clauson* (1954) 43 Cal.2d 280, 285 [272 P.2d 753].)

The word "estimate" is commonly defined as "a general calculation" or "an approximate computation." While we cannot say that under certain circumstances, the use of an estimate in a contract provision may not be sufficiently definite as to be enforceable, we can readily perceive inherent problems with that interpretation.

Moreover, what VRA fails to recognize is that if we were to construe the term as meaning an estimate, it could not be mandatory; it could only be directory. Impliedly, the *final* determination of the purse share could only be by *agreement of the* parties, a question of fact.

On the other hand, if "based on" means equal to the previous year's meet, the statute must be construed as mandatory. To construe it otherwise would render it ineffective and meaningless. (*Carter* v. *Seaboard Finance Co., supra,* 33 Cal.2d at p. 573.) There would be no purpose in the provision; a result which should not be reached in statutory construction. (*Ibid.*)

Under *either* interpretation, given the circumstances presented here, VRA loses. At best, were we to (or had the trial court) determine(d) that the term means "equal to," as a matter of law, not of fact, the verdict and award of damages would have been the same. Therefore, under the circumstances, the error would have been harmless.

Assuming that the term refers to an estimate, since we conclude that the legislative intent, in that circumstance, contemplates a subsequent finite agreement or contract, the issue becomes one of fact.

A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful. (Civ. Code, § 1636.) A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates. (Civ. Code, § 1647.)

 Interpretation of a written document where extrinsic evidence is unnecessary is a question of law for the trial court to determine. (*Temple* v. *Velcro USA, Inc.* (1983) 148 Cal.App.3d 1090, 1095 [196 Cal.Rptr. 531].) When the meaning of contractual language is doubtful or uncertain and parol evidence is introduced to aid in its interpretation, the meaning of the contract is a question of fact. (*Loree* v. *Robert F. Driver Co.* (1978) 87 Cal.App.3d 1032, 1039 [151 Cal.Rptr. 557].)

 In determining whether extrinsic evidence was properly admitted in this case, "the test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Murphy Slough Assn.* v. *Avila* (1972) 27 Cal.App.3d 649, 653 [104 Cal.Rptr. 136].)

Extrinsic evidence is admissible to interpret a document, but not give it a meaning to which it is not reasonably susceptible. Additionally, it is solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. (*U.S. Leasing Corp.* v. *duPont* (1968) 69 Cal.2d 275, 284 [70 Cal.Rptr. 393, 444 P.2d 65].)

 When parol evidence is introduced in aid of the interpretation of uncertain or doubtful language in the contract, the question of the meaning or intent of the parties is one of fact. If the meaning or intent is to be determined one way according to one view of the facts and another way according to another view, the determination of the disputed matter must be left to the jury. (*Kaufman & Broad Bldg. Co.* v. *City & Suburban Mortg. Co.* (1970) 10 Cal.App.3d 206, 216 [88 Cal.Rptr. 858].)

 Custom and usage of words in a certain trade are admissible to explain the meaning of the terms used in a contract. Custom and usage may not be used to vary the terms of the contract, but may be used as an aid in the interpretation of contracts. (*LaCount* v. *Hensel Phelps Constr. Co.* (1978) 79 Cal.App.3d 754, 770 [145 Cal.Rptr. 244].)

Here, the trial court allowed extrinsic evidence bearing upon the issue of what the parties intended by use of the term "based on." Charles Palmer, VRA racing secretary, testified that based on his understanding of the custom and practice of the industry, VRA was required to pay out purses in 1986 equal to the prior year's handle. In his opinion, the custom and practice of the industry was violated by VRA paying out less than the agreed amount.

Don Johnson testified that the parties decided to base the purses on the prior year's handle because (1) that was the law, and (2) they decided to change the procedure that had been used in 1985 when the purses had been based upon the current handle. In 1986 the parties decided to go back to basing the purses on the prior year's handle so they could understand how much money they would be paying out in purses. Johnson testified that the custom and practice of the industry was that for mixed meetings the purses paid in the current year would be equal to the purses generated in the prior year and that had been the custom for at least 10 years.

Richard Craigo testified he believed the contract language did not mean an estimate, but referred to the actual amount of the contract obligated to be paid.

VRA witness Leonard Foote testified that he did not agree that the size of the purse in 1986 was not determined by the current handle. He believed that in a mixed meet you looked to the current handle in making distribution.

VRA witness Benjamin Felton implied that purses should be based on the current handle when he explained the policy of CHRB regarding payment of purses in excess of pari-mutuel pool.

The most illuminating evidence of the parties' intention regarding payment of purse shares is gleaned from a series of communications between

Don Johnson, John Reagan and Burnett Sawtelle, of VRA, prior to the execution of the contract.

On March 31, 1986, Johnson testified he confirmed with Reagan of CHRB that the overpayment of purses in 1985 was $63,982. Reagan then sent a letter to Sawtelle on that same date confirming the overpayment figure and stating:

"Section 19613(d) requires that for fairs and mixed breed racing meetings the amount to be distributed as purses shall be based on respective parimutuel pools during the previous corresponding meeting. As such, I must adhere to my prior calculation based on the Board's standard method of calculating purse funds for fairs and mixed breed meetings. In your case, the overpayment of thoroughbred purses for 1985 amounts to $63,982.00."

Also on March 31, 1986, Johnson sent a letter to Sawtelle confirming figures discussed between Johnson and Sawtelle earlier that day. The letter stated:

"This will confirm our telephone conversation today wherein you indicated you would mail forthwith the Purse Agreement between Valley Racing Association and HBPA. I talked with John Regan [sic] again today in Sacramento and he confirmed that the overpayment in 1985 was approximately $64,000.00.

"You have approximately $619,883.00 available for your thoroughbred purse distribution in 1986. That is arrived at by determining the Net Distribution for 1985 in the approximate amount of $704,964.00. You must then reduce that number by 3% paid to the HBPA, i.e., $21,081.00 leaving the actual Net Distribution figure of $683,883.00 available for purse money.

"You must, however, deduct the overpayment from the prior year in the amount of $64,000.00 (if you intend to take it all in 1986) leaving $619,883.00 available for purses.

"You will want to advise the Racing Department of the money available so there will be no slip-ups in 1986.

"Should you have any questions in connection with my figures, please telephone."

No objection to the figures set forth in the letters was received from Sawtelle. Subsequently, Johnson received the executed contract from VRA with a cover letter dated April 16, 1986.

 From the testimony adduced at trial and set forth above, we can see that there was conflict regarding the intention of the parties in payment of the purses. As such, extrinsic evidence was admissible to explain the meaning in the written instrument of the term "based on." Both parties presented evidence to which the language of the contract was reasonably susceptible. (Cf. *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].) Although the term used in the contract is the same term used in former section 19613, subdivision (d), the issue before the court was not the interpretation of the statutory language but of the intent of the parties in entering into the contract. Thus, under this analysis, the court did not err in submitting the issue of interpretation of the term "based on" to the jury under the facts of this case.

*Was VRA's performance under the contract excused because of CHRB action?*

As noted previously, Foote and Reagan told Nevin, of VRA, to cut purses for the 1986 meet after it appeared that the reserve was less than anticipated. VRA contends that because Foote and Reagan were from the CHRB, VRA was required to follow their directives, thereby excusing performance of the contract.

We disagree. Jurisdiction and supervision over meetings in this state where horse races with wagering on the results are held or conducted, and over all persons or things having to do with the operation of such meetings, is vested in the CHRB. (§ 19420.) The CHRB consists of seven members, appointed by the Governor. (§ 19421.)

Section 19431 provides the manner in which action is taken by the CHRB. It states in pertinent part:

"At least four members of the board shall concur in the taking of any official action or in the exercise of any of the board's duties, powers, or functions."

Section 19440 sets out the powers and responsibilities of the board. It provides as follows:

"(a) The board shall have all powers necessary and proper to enable it to carry out fully and effectually the purposes of this chapter. Responsibilities of the board shall include, but not be limited to, all of the following:

"(1) Adopting rules and regulations for the protection of the public and the control of horseracing and parimutuel wagering.

"(2) Administration and enforcement of all laws, rules, and regulations affecting horseracing and parimutuel wagering.

"(3) Adjudication of controversies arising from the enforcement of those laws and regulations dealing with horseracing and parimutuel wagering.

"(4) Licensing of each racing association and all persons, other than the public at large, who participate in a horseracing meeting with parimutuel wagering.

"(5) Allocation of racing dates to qualified associations in the best interests of the people of California in accord with the intent of this chapter.

"..............................."

Section 19562 gives the board the power to prescribe rules, regulations and conditions, consistent with the provisions of the chapter, under which all horse races with wagering on their results shall be connected in the state. The board shall adopt rules governing, permitting and regulating mutuel wagering on horse races under the system known as the pari-mutuel method of wagering. Such wagering shall be conducted only by a person licensed under this chapter to conduct a horse racing meeting, and only within the enclosure and on the dates for which horse racing has been authorized by the board. ( § 19590.)

▉▉▉ VRA argues the CHRB believed it had authority to order the purses cut and that the CHRB knew that John Reagan and Leonard Foote held themselves out as enforcers of the California horse racing law. However, no evidence was presented to establish that the CHRB ever took any official action with regard to this matter. Leonard Foote admitted that he was not acting pursuant to any directive from the board, nor had he conferred with any other board member. John Reagan also conceded that he acted solely on his own without any direction from the board, nor did he talk to any board member.

▉▉▉ When a statute prescribes the particular method in which a public officer, acting under a special authority, shall perform his duties, the mode is the measure of the power. (*Cowell* v. *Martin* (1872) 43 Cal. 605, 614.) While the courts will go to all reasonable lengths in interpreting statutes conferring powers on officers of the state in order that laws may be given effect and the ends of justice served, they cannot by construction confer on any officer an authority that the Legislature has seen fit to withhold. (*Bear River etc. Corp.* v. *County of Placer* (1953) 118 Cal.App.2d 684, 690 [258 P.2d 543].) No

government, whether state or local, is bound to any extent by an officer's acts in excess of his authority. (*Ibid.*)

One who deals with the public officer stands presumptively charged with a full knowledge of that officer's powers, and is bound at his peril to ascertain the extent of his powers to bind the government for which he is an officer, and any act of an officer to be valid must find express authority in the law or be necessarily incidental to a power expressly granted. (*Board of Administration* v. *Ames* (1963) 215 Cal.App.2d 215, 230 [29 Cal.Rptr. 917], disapproved on another point in *Breese* v. *Price* (1981) 29 Cal.3d 923, 931 [176 Cal.Rptr. 791, 633 P.2d 987].) Accordingly, VRA was bound to ascertain the extent of the authority of Reagan and Foote before assuming that they spoke for the CHRB.

Moreover, VRA cites no authority which holds that the unauthorized actions of Foote and Reagan, ostensibly acting on behalf of CHRB, could *permanently* excuse the *performance* of a contract between parties otherwise unaffiliated with CHRB.

*Was VRA's payment of purses in excess of the pari-mutuel handle excused by article VIII of the purse agreement?*

VRA next argues that it was excused from performance under the contract by the express language of article VIII. Article VIII is entitled "FORCE MAJEURE" and reads as follows:

"8.1(a) . . . [¶] (b) In the event that the California Horse Racing Board of the California Legislature amends or repeals any sections of the Horse Racing Law which are applicable to TRACK's 1986 race meet, or otherwise withdraws, reduces or terminated [*sic*] the take-out provisions relating to monies for purse distribution and exempt breakage provisions of this agreement shall, at the option of either party to this agreement, be terminated by a minimum of one (1) week's prior written notice to the other party.

"8.2 TRACK or HBPA may terminate this agreement for the year in question due to labor disputes, strikes or other disruptions or circumstances beyond TRACK's control."

 Force majeure is not necessarily limited to the equivalent of an act of God, but the test is whether under the particular circumstances there was such an insuperable interference occurring without the parties' intervention as could not have been prevented by prudence, diligence and care. (*Pacific Vegetable Oil Corp.* v. *C. S. T., Ltd.* (1946) 29 Cal.2d 228, 238 [174 P.2d

441].) In *Northern Indiana Pub. Serv.* v. *Carbon County Coal* (7th Cir. 1986) 799 F.2d 265, the court reviewed a party's reliance on a force majeure clause in a long-term fixed-purse coal contract. The party sought a declaration that it was excused in its obligations because the commission which regulated fuel rates had ordered the party (a utility) to buy from utilities that would sell electricity to it at prices lower than its cost of internal generation. The court rejected the force majeure argument, holding:

"A *force majeure* clause is not intended to buffer a party against the normal risks of a contract. The normal risk of a fixed-price contract is that the market price will change. If it rises, the buyer gains at the expense of the seller . . . ; if it falls, as here, the seller gains at the expense of the buyer. . . . A *force majeure* clause interpreted to excuse the buyer from the consequences of the risk he expressly assumed would nullify a central term of the contract." (799 F.2d at p. 275.)

VRA argues that paragraph 8.1(b) excuses its payment of purses in excess of the current handle because the CHRB, through Leonard Foote and John Reagan, reduced the moneys for purse distribution. As we have previously decided, this argument is without merit.

VRA next contends that paragraph 8.2 gives it an explicit contractual right to terminate the agreement for circumstances beyond its control. VRA argues the termination effectively occurred when it discussed with HBPA reduction of the handle and the need to either terminate the race meet or reduce the handle. VRA argues that the horsemen agreed to continue to participate at a reduced purse structure and VRA agreed to perform at the meet. VRA's argument in this regard finds little support in the record. To the extent that certain ambiguous testimony supports this conclusion, the jury, by its verdict, rejected the theory of modification or termination. Here, the VRA took no action to *terminate* the meet or to *terminate* the agreement. It simply decided to pay less for purses than they had been paying. We do not construe paragraph 8.2 to countenance a unilateral modification of payouts merely because the revenues were not as projected.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

---

*See footnote, *ante*, page 1538.

## DISPOSITION

The judgment is affirmed and the cause remanded with direction to the trial court to determine reasonable attorney fees for services performed on appeal and add such fee to the principal amount of the judgment.

Stone (W. A.), Acting P. J., and Dibiaso, J., concurred.