[No. H012397. Sixth Dist. Dec. 7, 1995.]

Estate of TAI-KIN WONG, Deceased.
XI ZHAO, as Adminstrator, etc., Petitioner and Respondent, v.
TAI-SHING WONG et al., Contestants and Appellants.

## COUNSEL

Hallisey & Johnson and Jeremiah F. Hallisey for Contestants and Appellants.

McManis, Faulkner & Morgan, James McManis, William Faulkner and Lisa Herrick for Petitioner and Respondent.

## Opinion

**WUNDERLICH, J.**—In this case we review the trial court's decision that a document containing eight words, seven of them proper names and an appellation, constituted a holographic will.

Tai-Kin Wong (Tai) was a successful 44-year-old businessman who until just before death had a history of good health. He was living with his girlfriend Xi Zhao (Xi), and he enjoyed a close and loving relationship with his large family. On New Year's Eve in 1992, he took ill and died in a hospital emergency room of unexplained causes. Sometime after his death, found in his office was a sealed envelope, decorated with stickers and containing a handwritten note which read "All Tai-Kin Wong's → Xi Zhao, my best half TKW 12-31-92." This document—containing no subject, no verb, no description of property, and no indication of its subject matter or purpose—was found by the trial court to be a holographic will, passing Tai's entire estate to Xi. Tai's father, Kok-Cheong Wong (appellant)[1] brought this appeal. For the reasons stated below, we will reverse the judgment.

### Facts and Procedural History

At the time of his death, Tai was 44 years old. He had never married and he had no children. For the previous three years, he and Xi had lived together in Saratoga. Tai and Xi had met in 1987 at a scientific conference. They fell in love and began to live together in 1989 after Xi received her doctorate in cell biology. They lived together until the time of Tai's death on New Year's Eve.[2]

When Xi relocated to California to be with Tai, she turned down several job offers that were more attractive than the one she accepted at Stanford University. Previously she had visited Tai in California and they had kept in close touch. She immediately moved into his house in Saratoga and worked at her full-time job at Stanford. Tai, meanwhile, was engaged in running a company he founded with his brother, Danny Wong (Danny) called Baekon, Inc. Xi helped Tai run Baekon, working for Baekon in the evenings and on weekends. In 1990 Tai and Xi founded a new company, Transgenic Technologies, Inc. (TTI) which they owned equally. Tai worked every day at TTI in Fremont, developing the new business. Baekon was wound down; Danny transferred his interest in the business to Tai.

---

[1] At oral argument Mr. Wong's attorney stated that Mr. Wong has died. Tai's siblings have been substituted as appellants.

[2] Whether Xi lived with Tai during the latter months of 1992 was disputed bitterly, as was every other significant fact in this case.

Tai and Xi thus lived together and worked together for the last three years of Tai's life. Whether their love relationship was flourishing or floundering was disputed at trial. Though supposedly lovers, on the day of Tai's death, New Year's Eve, they had arranged to dine separately—Tai with his close friend, Dr. Jianmin Liu and his girlfriend, and Xi with a man she describes as then a casual social acquaintance, Brien Wilson, a local attorney.

The evidence Xi introduced tended to show that she was close to Tai's family, indeed, practically accepted as a member of it. After Mr. Wong came home from the hospital following a stroke, Tai and Xi took care of him four nights a week, Monday through Thursday. Mr. Wong viewed Xi as his son's companion, and presented her with gifts of money, traditionally given only to family members in Chinese families.

When Tai died on December 31, 1992, it was in the throes of an illness which was similar in its symptoms to sicknesses that had afflicted him two or three times earlier that month. On December 11, 1992, he felt very ill while dining in a restaurant. Xi told him to see a doctor. On December 20, 1992, Tai collapsed at home but recovered and told Xi he would be fine. On December 21st he called Xi at her Stanford office and told her he was sick again. Xi told Tai to call "911"; he was taken to Washington Hospital in Fremont by ambulance. He spent three days in the intensive care unit. Doctors were unable to diagnose his illness, but wished to do a test which Tai declined. On December 31st, he again became ill, was taken to the hospital by ambulance, and died with the same symptoms.

The onset of the final episode was unclear. During the day on New Year's Eve, Tai was working at his office in Fremont. He had business meetings that afternoon until about 4:30, which Xi and others attended. Although not 100 percent healthy, he appeared to be well and to be functioning well. He called Dr. Liu two or three times to finalize dinner arrangements for the evening. Another employee who was working at the office waved good-bye to Tai at 6 p.m. and he appeared to be just fine. At 7 p.m. Dr. Liu received a call from Tai saying that he was feeling very ill. Dr. Liu's girlfriend advised him to call "911" which Tai did. His friends agreed to come to the Fremont office from Berkeley. When they reached the office the ambulance had already taken Tai to the hospital. The ambulance attendants found Tai conscious upon their arrival at the office building, but he lost consciousness in the ambulance, never regained it, and died at the hospital before midnight.

By the time Dr. Liu and his girlfriend Jennifer Zhang arrived at the hospital, Tai was in a coma. When the doctors told Dr. Liu that Tai was

dying, he tried to reach members of Tai's family. Because he did not have their telephone numbers, he called Tai's Saratoga house trying to reach Xi. There was no answer. Meanwhile, Xi was having dinner with Brien Wilson at a fancy French restaurant in Los Gatos. She had concealed from Tai the fact that she was dining on New Year's Eve with Brien Wilson, a man she moved in with two and one-half months after Tai's death. After dinner, she returned to the Saratoga house, and shortly after her arrival she received a call from Dr. Liu informing her that Tai was in the hospital. (Dr. Liu testified he never did reach Xi on the telephone. Rather, she called him at the hospital after Tai's death.) According to Xi, when she arrived at the hospital, close to midnight, Tai was already dead. While Tai had some symptoms similar to those that characterized his illness 10 days earlier, the cause of death was mysterious and has never been determined.

The questioned document or purported will was discovered in the following way: Xi made no effort to find a will at the residence she shared with Tai. Instead, on January 18, 1993, two weeks after Tai's funeral, Xi, Roy Tottingham (then a business consultant to TTI and now vice-president), Dr. Gin Wu (a TTI employee) and Heston Chau (an old friend of Tai's) searched Tai's office. Xi had asked Danny Wong to help go through Tai's papers, but he refused to do it. These four people, then, including Xi, divided the papers into business documents and personal papers and placed them in separate boxes.

During this search they found a sealed envelope in one of Tai's desk drawers, but Xi could not remember which one nor who saw it first. The upper left hand corner contained Tai's address label, the center of the envelope bore two stickers: a rainbow with the words "You're Special," and a rainbow with the words "Love You." This sealed envelope was placed in the box of Tai's personal papers which itself was sealed. Later the sealed box was placed in Xi's office where it remained unopened.

Dr. Victor Vurpillat, (the co-chief executive officer of TTI when Tai was alive), opened the box in Xi's office sometime later. The only item he removed from the box was the envelope with the stickers. Vurpillat took the envelope and the following day he and Roy Tottingham met with TTI's attorney, together with a probate attorney, John Willoughby, who opened the envelope.

After Tai's death, Xi and Tottingham and Vurpillat incorporated a new company called Transcell Therapeutic Infusion, Incorporated. (TTI, Inc.) Obviously the initials are the same as for Transgenic Technologies, Inc. The new business involves intracellular therapy. Its product is one that delivers

ribozyme (a specific molecule) into cells to achieve intracellular therapy for patients infected with viruses. Xi claims to have invented the technology used in TTI, Inc. but could not recall when. She was also certain that TTI, Inc.'s processes did not require the use of any TTI or Baekon technology.

Xi filed a petition for probate of the purported will. Xi was first appointed personal representative and Tottingham was appointed special administrator for the purpose of handling Tai's real estate and voting his shares of stock. Mr. Wong, from whom the family had kept word of Tai's death for some six weeks because of Mr. Wong's poor health, filed the will contest on May 14, 1993.

## CONTENTIONS OF PARTIES

Appellants contend: the document admitted to probate is not a valid will, because as a matter of law, the words in the document cannot constitute a will and because there is not sufficient evidence of testamentary intent. Appellants also contend that the trial court erroneously excluded decedent's statements regarding his feelings toward respondent and also erred in granting respondent's motion to quash certain deposition subpoenas. Respondent Xi disputes each contention.

## DISCUSSION

The document the trial court found to be a will reads as follows: "All Tai Kin Wong's → Xi Zhao, my best half." Beneath are the initials "TKW" and the date "12-31-92." The document is completely handwritten.[3]

■ The parties dispute the standard of review. Whether the questioned document can constitute a will as a matter of law is a legal question subject to independent review. (*Horsemen's Benevolent & Protective Assn.* v. *Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1559 [6 Cal.Rptr.2d 698].) If the document can constitute a will, the finding that it expresses testamentary intent is subject to a substantial evidence review. (*Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384].)

■ A holographic will is one entirely in the writing of the testator. The requirements are that it be signed, dated, and that it evidence testamentary intent. (See Prob. Code, § 6111.)[4] The trial court resolved the issue of whether the will was in the writing of the testator in favor of proponent Xi.

---

[3]For clarity, we attach hereto a copy of the document which was admitted into evidence by the trial court as petitioner's exhibit 1.

[4]All further statutory references are to the Probate Code unless otherwise indicated.

Clearly the document is dated at the bottom. Regarding the third require-ment, Witkin says "[I]t must appear that decedent intended to make a testamentary disposition *by that particular paper*, and if this cannot be shown it is immaterial that his testamentary intentions were [or would have been] in conformity with it." (12 Witkin, Summary of Cal. Law (9th ed. 1990) Wills & Probate, § 213, p. 251, italics in original.)

◼ No particular words are required to create a will. "Thus, a letter or other informal document will be sufficient if it discloses the necessary testamentary intent, i.e., if it appears that the decedent intended to direct the final disposition of his property after his death. *The surrounding circum-stances may be considered in reaching a conclusion on this issue.* [Cita-tions.]" (12 Witkin, Summary of Cal. Law, *supra*, Wills & Probate, § 209, p. 248, italics added.) In other words, if it is not completely clear that the document evidences testamentary intent, it is possible to resort to extrinsic evidence of the surrounding circumstances in order to provide it.

◼ As a preliminary matter, we take up the parties' dispute as to the effect of section 8252. It provides in pertinent part: "At the trial, the proponents of the will have the burden of proof of due execution. The contestants of the will have the burden of proof of lack of testamentary intent or capacity, undue influence, fraud, duress, mistake, or revocation." Respondent argues that appellants failed to meet the burden of proving lack of testamentary intent. Appellants argue and we agree that section 8252 does not apply to this case.

Section 8252 is meant to apply to documents that are clearly wills. Thus, the one challenging a document that apparently is a will and does exhibit testamentary intent, must prove testamentary intent was lacking due, for example, to undue influence. Where the question is *whether* a document exhibits testamentary intent, clearly this rule does not apply.

In resolving the central issue in this case, we reviewed many cases to study the sorts of documents courts have interpreted to be wills, and the sorts of applicable extrinsic circumstances considered. Briefly we review some of these cases.

In *Estate of Spitzer* (1925) 196 Cal. 301, 306 [237 P. 739], the testator was ill. He wrote his brother regarding the property he wanted to go to his wife and daughter. The extrinsic circumstances indicating the letter was meant to be a will were that he told both his brother and his neighbor that he was making a will and sending it to his brother.

In another case the decedent Beffa wrote "I sign and [transfer] . . . [this] Deed" and some other things to his aunt. (*Estate of Beffa* (1921) 54

Cal.App. 186, 188 [201 P. 616].) Beffa committed suicide while in the midst of dissolving a partnership. He lived with his aunt to whom he was very close. The question was what appears from the face of the instrument; it appeared that Beffa intended the described property to go to his aunt. He left the document in the safe at the business, and nondelivery tends to show that it was a will.

In *Estate of Button* (1930) 209 Cal. 325, 330 [287 P. 964], decedent wrote a long letter to her ex-husband, immediately before she committed suicide. The document was found in the same room in which she was found. In it she said " 'I'd like to be cremated. You can have the house on 26th ave. and all things of value so you won't be out any money on burying me.' " While the letter went on for many pages and covered many subjects including how ex-husband should care for the parties' son, still the court found these few words at the end of the letter to be a valid holographic will.

During military service, a seaman wrote a letter to his friend saying: "[I]n case *Davie Jones* gets me out in the South Pacific ocean in other words lost at Sea," a certain person was to have his property. (*Estate of Taylor* (1953) 119 Cal.App.2d 574, 579 [259 P.2d 1014], italics in original.) Although Taylor contemplated death in battle during wartime, he returned from the war safely, and acknowledged and republished his will. He repeatedly told the beneficiary that the third party to whom he wrote the letter was holding the will and that she would receive his property. The court held it was a valid will. One issue considered was whether the will was conditional on his dying at sea. The court found that although the possibility of dying at sea was the occasion for the making of the will, the testator reaffirmed it repeatedly after he came back alive from serving in the Navy. (For examples of interesting holographs see *Halldin* v. *Usher* (1958) 49 Cal.2d 749 [321 P.2d 746]; *Estate of Heuler* (1929) 207 Cal. 391 [278 P. 1031]; *Estate of Stephenson* (1965) 235 Cal.App.2d 326 [45 Cal.Rptr. 121]; *Estate of Geffene* (1969) 1 Cal.App.3d 506 [81 Cal.Rptr. 833]; *Estate of Kuttler* (1958) 160 Cal.App.2d 332 [325 P.2d 624].)

Perhaps one of the most extreme examples of a court's finding a document to be a holographic will is *Estate of Smilie* (1950) 99 Cal.App.2d 794 [222 P.2d 692]. The decedent, long having quarreled with his wife and stepdaughter, wrote a somewhat illiterate letter to his close friend Max describing a recent altercation and stating he didn't want the stepdaughter to get anything. Smilie wrote: " 'I want you to see that all my bills are paid and that Dot does not get thing. I want you to have all of my after my bill are.' " (*Id.* at p. 796.) Observing the principle that one cannot supply words into a will in order to make it have testamentary intent, but that striking certain words as surplusage is permissible, the court found a valid holographic will. The sentence was changed to read " 'I want you to have all.' " (*Id.* at p. 797.)

Finally, we discuss a case which in some ways is most on point. In *Estate of Blain* (1956) 140 Cal.App.2d 917 [295 P.2d 898], the decedent, Frank Blain, executed a holographic will and put it in his safety deposit box. The will failed to mention his only heir, Sonia Lambert, and nothing in the will indicated that the omission was intentional. Thus, she was presumptively entitled to inherit the entire estate as a pretermitted heir. However, one of the devisees under the holographic will contended that a piece of paper, wrapped around a dinner ring in the safety deposit box, containing the words " 'to Sonia Lambert Frank Blain,' " was an integral part of the will. If so, provision was made for the natural object of Blain's bounty (Sonia), so that the remainder of the holographic will giving all of his property to others would have been valid. (140 Cal.App.2d at pp. 918-920.) The trial court thus grappled with the issue of whether the paper containing the five words including the signature could constitute a document that was testamentary in character, and whether it could be integrated into the seven-page holograph. The trial court found the document was not testamentary in character, it contained no testamentary disposition and exhibited no testamentary intent. (*Id.* at p. 920.) Reviewing the sufficiency of the evidence, the appellate court agreed. It pointed out that the document contained no description or specification of any property, and that a holographic will must be complete in itself. (*Id.* at pp. 921-922.) In other words, the document must contain some indication that it is intended to convey something upon death, or it is not a will. Testamentary intent may be found when the decedent uses words indicating a transfer of specified property upon the death of the testator. (See, e.g., *Estate of Taylor*, *supra*, 119 Cal.App.2d 574.) But when the document itself does not express an intention to convey property upon death, it does not exhibit the intent necessary for a will. (*Estate of Blain*, *supra*, 140 Cal.App.2d at p. 922.) Evidence before the court indicated Sonia's grandmother had left Sonia the ring and Blain was only holding it for her. Such extrinsic evidence as there was, then, tended to show the ring already belonged to Sonia, and Frank Blain's writing only indicated that it was hers, not that he was giving it to her. (*Ibid.*) Thus, Frank Blain's attempt to disinherit his only heir was unsuccessful. Because he did not specifically disinherit her in the holographic will, the will was invalid and she took the entire estate. As the trial court noted: " '[A] little learning is a dangerous thing.' " (140 Cal.App.2d at p. 925.)

We can see that the instant case thus differs from even the existing similar cases. In most of the cases just discussed, we find descriptions of property and words expressing donative intent. In the cases in which it is a little bit doubtful whether the proffered document is a will, we often have the express statement of the decedent, made shortly before death, that decedent has written his or her will and provided for decedent's loved ones in a certain

letter or in a certain document. Clearly such direct extrinsic evidence is extremely probative on the question of whether a document is a will. In the instant case, we have no such helpful extrinsic evidence.

■ Appellants contend the document admitted to probate cannot, as a matter of law, constitute a will. We agree.

We consider this document which is offered as a holograph to be unique. The document consists of eight handwritten words—five of them constituting two proper names and three of them constituting an appellation, one arrow, a date and initials at the bottom. This series of words contains no recognizable subject, no verb and no object. The trial court below found these words constituted a valid holographic will under California law, the import of which was to bequeath all of decedent's estate to Xi. We conclude that it simply does not contain words sufficient to constitute a valid will.

No particular words are required to create a will. (*Estate of Weber* (1926) 76 Cal.App. 723, 725 [245 P. 776].) But every will must contain operative words legally sufficient to create a devise of property. (*Estate of Young* (1899) 123 Cal. 337, 343 [55 P. 1011].) In this case, the words are either absent or are so ambiguous in meaning that it is impossible to tell what, if anything, is meant to be given, much less that it is intended to be a transfer of property upon death.

First, no words describe the property allegedly meant to be bequeathed, or even that it is property which is the subject of the note. In attempting to determine the meaning of this first phrase the question is, all of Tai-Kin Wong's what? The trial court found that the absence of a "what" meant all of Tai's property but there is nothing in the document that supports that speculation.

Nor does the document contain any donative words—not "give," "bequeath," "will," or even "want Xi Zhao to have." Instead of a word that indicates a gift or transfer of some sort, Xi contends that the arrow is meant to transfer Tai's entire estate to her upon his death. However, an arrow is not a word at all. It is a symbol with no fixed meaning, either in the general community or as used by the decedent himself. As such, it does not have one meaning which allows it to be used in place of a word, nor can it be used to supply any meaning to the words around it.[5]

Appellants did not find, nor have we, a single case in which a symbol has been used in place of words indicating donative intent in a will. In fact, we

---

[5]Holographic wills are proved like other writings. (§ 8222.) Evidence Code section 1410.5 says that for purposes of authenticating a writing, "graffiti" includes "words, insignia,

have not found a case in which a symbol of no fixed meaning has been used in any material clause of a will. The Probate Code itself assumes that words will be used to create a will. (See, e.g., § 21122.)[6] The entire purpose of a will is to express the decedent's wishes for disposition of his or her property after death. If there are insufficient words in the document to do that, or if there are no words at all but ambiguous symbols, the decedent has failed in his or her purpose even if decedent did intend to write a will. The document in this case falls into that category; it simply does not contain operative words legally sufficient to accomplish a transfer of property upon death. Because this first issue is dispositive, we need not address appellants' other assignments of error.

### DISPOSITION

Because the questioned document cannot constitute a will as a matter of law, the judgment is reversed and the trial court is directed to enter judgment in appellants' favor. Costs to appellants.

Bamattre-Manoukian, Acting P. J., and Mihara, J., concurred.

A petition for a rehearing was denied January 8, 1996, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied February 22, 1996.

---

symbols, or any other markings which *convey a particular meaning.*" (Italics added.) An arrow is not such a symbol.

[6] Section 21122 provides in part: "The words of a will are to be given their ordinary and grammatical meaning unless . . . ."

1210

FILED

HAR 15 / 52 PM '93

All TAi-KiN WONG's

FILMED

→ Xi ZHAO, my

best half

130221

12-31-92

PR 130221   Exh # 1

No.

☐ Identification   ☒ Admitted

Estate of Wong

Date   NOV 1 2 1993   Clerk   JOE VELA