Filed 11/15/24  JHS Family Limited Partnership v. County of Fresno CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JHS FAMILY LIMITED PARTNERSHIP et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> COUNTY OF FRESNO, <br><br> Defendant and Appellant. | F087092 <br><br> (Super. Ct. No. 15CECG02007) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan M. Skiles and D. Tyler Tharpe, Judges.*

Daniel C. Cederborg, County Counsel, and Peter Wall, Chief Deputy County Counsel, for Defendant and Appellant.

Wilkins, Drolshagen & Czeshinski and James H. Wilkins for Plaintiffs and Respondents.

California State Association of Counties and Joseph Wells Ellinwood as Amicus Curiae on behalf of Defendant and Appellant.

-ooOoo-

---

*       Judge Skiles presided over the trial and issued the statement of decision; Judge Tharpe signed the judgment pursuant to the statement of decision.

Defendant and appellant County of Fresno (County) appeals from a judgment rendered against it and in favor of plaintiffs and respondents JHS Family Limited Partnership, JCH Family Limited Partnership, and DBH Family Limited Partnership (collectively, plaintiffs) after a bench trial in the Fresno County Superior Court.

The trial court found County in breach of a contractual obligation to plaintiffs to disclose to them that real property they were bidding on and ultimately purchased at a county tax sale was contaminated with hazardous chemicals. The judgment awarded plaintiffs $564,299.33 in general damages for remediation costs they incurred and decreed County liable to plaintiffs for "any and all ongoing costs associated with remediation of contamination" associated with the property.

In an earlier appeal in this matter, we reversed a prior judgment of dismissal entered by the trial court after it sustained County's demurrer to plaintiffs' second amended complaint without leave to amend. In reversing the judgment, we concluded plaintiffs' allegations that County entered into a valid contractual obligation to disclose known or suspected contamination on the property and that it breached that obligation, if true, would subject County to liability for damages suffered by plaintiffs notwithstanding any statutory liability protections enjoyed by County in connection with tax sale procedures.

In this appeal, we conclude the evidence elicited at trial does not support the trial court's findings that County validly contracted to make the above-referenced disclosures or, alternatively, that it ratified such a contractual obligation. We further conclude County was not estopped from denying the validity of the purported obligation. Accordingly, we reverse the judgment and remand the matter to the trial court with directions.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are three limited partnerships owned by members of a single family. Plaintiffs are in the business of acquiring and renting commercial and residential real

estate.  The properties are managed by another family-owned business, JDB Properties, Inc.  Bryce Hovannisian, a family member, works for JDB Properties, Inc. and manages plaintiffs' commercial properties and all of plaintiffs' properties located in Fresno, Madera and Merced Counties.  Hovannisian also acts as an agent for plaintiffs in seeking out and purchasing properties to add to plaintiffs' real estate portfolio.

## I.	The Board of Supervisors Approves a Tax Sale

On December 3, 2013, the Fresno County Board of Supervisors (Board of Supervisors) considered and approved a recommendation of the Fresno County Auditor-Controller/Treasurer-Tax Collector (Tax Collector) to conduct a tax sale of tax-defaulted properties (tax sale approval), including the property commonly known as 2696 South Maple Avenue, Fresno, California (subject property).  Specifically, the Board unanimously approved the following recommendations:

> "1.  Approve the selling of properties listed on the attached Tax Sale List, which is on file with the Clerk to the Board, for the March 7-10, 2014 Public Internet Auction, subject to the Tax Collector's power to sell; and

> "2.  Direct the [Tax Collector] to sell the properties at the Public Internet Auction for the stated minimum bid in accordance with Chapter 7 of Part 6 of Division 1 of the California Revenue and Taxation Code [i.e., Rev. & Tax Code, §§ 3691–3731.1 (tax sale statutes)]; [1] and

> "3.  Approve the reduction in the minimum bid if no bids are received and approve the reoffer at the reduced minimum bid during the tax sale, of these parcels at a price, which the [Tax Collector] deems appropriate pursuant to … section 3698.5.

> "4.  Approve that any unsold parcels be reoffered for sale within a 90-day period and new parties of interest shall be notified pursuant to … Section 3692(e)."

The agenda item setting forth the Tax Collector's recommendations estimated the fiscal impact of the action as follows:  "There is no increase in net County cost associated

---

[1]	All further statutory references are to the Revenue & Taxation Code unless otherwise noted.

3.

with the recommended action.  The County recovers the cost of sale and enough to pay the outstanding delinquent taxes, penalties and costs for the vast majority of parcels sold at auction."

## II.      Plaintiffs Purchase the Subject Property at the Tax Sale

In 2013, Hovannisian was looking to purchase property for plaintiffs' use as a warehouse.  He became interested in the subject property, which was to be auctioned by County.  Hovannisian inspected the property in person, "reviewed the public information on it, [and] checked the zoning."  He was able to gain entry to the on-site building and testified the electrical system had been vandalized, copper wiring and brass sprinkler heads had been stolen, and water leaks had caused "dark mold and mildew."  He estimated it would cost plaintiffs "about a million and a half dollars to rehab" but determined it would be a suitable property for plaintiffs' needs and worth the opening bid of $460,000.

The subject property came up for auction on the internet platform Bid4Assets.com, which County used to conduct its tax sale auctions.  Hovannisian was already familiar with the auction process on Bid4Assets.com, having previously participated in 15 County sponsored auctions.

In March 2014, when the auction of the property closed, Hovannisian, as plaintiffs' agent, was the successful bidder.  On May 5, 2014, a tax deed was recorded to show that plaintiffs were now the legal and beneficial owners of the subject property.

Hovannisian testified that, to participate in the auction, he was required to accept a two-page "Terms of Sale," which he understood set forth the obligations of County and any successful bidder.  The trial court agreed, finding "County entered into a valid contract with [plaintiffs] for the sale of the subject property" and "[t]he contract included the [T]erms of [S]ale …."

The Terms of Sale were the same as the County had used in auctioning other properties previously purchased by Hovannisian and, according to him, were largely the

4.

same as those used by other California counties in conducting tax sale auctions. The Terms of Sale read, in relevant part:

"• Prospective purchasers are urged to examine the title, location and desirability of the properties available to their own satisfaction prior to the sale. **ALL PROPERTIES ARE SOLD AS IS.** The County of Fresno makes no guarantee, expressed or implied, relative to the title, location or condition of the properties for sale….

"• **NOTICE OF CONTAMINATED / POSSIBLE CONTAMINATED PROPERTIES** When we become aware of properties on our sales list that are known or suspected to be contaminated, the Asset Page will identify these properties and the Lead Agency's name and address where all available information may be reviewed. **DO NOT** bid on these properties unless you understand the issues related to contaminated properties. Prior to bidding, you should contact your attorney regarding the possible purchase of contaminated properties." (Hereafter, contamination disclosure provision.)

The Terms of Sale continued, in relevant part:

"• … The [Tax Collector] cannot guarantee the condition of the property nor assume any responsibility for conformance to codes, permits or zoning ordinances. **You should inspect the property before investing. The burden is on the purchaser to thoroughly research, before the sale, any matters relevant to his or her decision to purchase, rather than on the [C]ounty, whose sole interest is the recovery of back taxes.**

"[¶] • It is recommended that bidders consult with the Zoning Department of any city within which a particular parcel lies. **Tax defaulted property will be sold on an 'as is' basis.**

"[¶] • … No warranty is made by the County, either expressed or implied, relative to the usability, the ground location, or property lines of the properties. The exact location, desirability, and usefulness of the properties must be determined by the prospective purchaser.

"[¶] …[¶] • **ALL SALES ARE FINAL.**" (Bold print added.)

Although various County departments (including the Tax Collector's office) had information that the subject property was contaminated, the Asset Page on Bid4Assets.com did not identify it as contaminated.

5.

### III. Plaintiffs Learn the Subject Property Is Contaminated

Plaintiffs first became aware the subject property was contaminated upon receiving a December 11, 2014, letter from the Central Valley Regional Water Quality Control Board (water board) informing them they were responsible for providing "a work plan and time schedule … for cleaning up the on-site contaminated soils and defining the extent of groundwater degradation." The letter described the known extent of the contamination based on prior testing. The following day, the water board sent plaintiffs a letter advising them they are responsible "for assessment and remediation of the site," and that the water board is legally entitled "to recover [its] reasonable expenses" in overseeing the investigation and remediation process.

Hovannisian performed no due diligence prior to the auction to determine if the subject property had environmental contamination. He testified he "didn't need to, because the County discloses that on the spreadsheets." He explained that County provides Bid4Assets.com with a spreadsheet containing information about properties to be sold, including a section where properties with known or suspected contamination issues are disclosed. Hovannisian said he relied on the absence of any such disclosure in the information provided by County when he bid on the subject property and, had he been advised it was contaminated, he would not have bid on it.

After receiving the December 2014 letters from the water board, Hovannisian contacted "Natalie" at the Tax Collector's office, explained the situation, and inquired about the process for rescinding the tax sale. He testified Natalie told him, "[I]t's not an option; … all sales are final and [they] were stuck with the property."[2]

On March 26, 2015, plaintiffs, through their attorneys, submitted a "Claim for Damages" (government claim) to County pursuant to section 910 of the Government

---

**2**     Hovannisian did not further identify "Natalie" and provided no information concerning her position at the Tax Collector's office.

6.

Claims Act (Gov. Code, § 810 et seq.). It read, in part: "Pursuant to its own written Terms of Sale, … County was contractually obligated to disclose known or suspected … contaminations of the Subject Property…. The County breached its contractual obligation …, and in reliance upon the fact that there were no known or suspected contaminants located on the Subject Property, [plaintiffs] … purchased the Subject Property." The government claim stated plaintiffs had submitted a winning bid of $460,000 for the property and advised the "estimated cost of remediation will be at least $500,000.00, and likely more." On June 2, 2015, County rejected plaintiffs' claim.

On October 15, 2015, plaintiffs hired Moore Twining Associates, Inc. (Moore Twining) to provide consulting services in connection with monitoring and testing the subject property for environmental contamination. Moore Twining put into effect a plan to remediate soil contamination on the property but, as of the date of trial, no plan had been created to address potential groundwater contamination at the site.

Hovannisian testified that, as of the date of his trial testimony, plaintiffs had incurred and paid $564,299.33 in costs and expenses associated with their remediation efforts. Moore Twining estimated the total future costs of soil and groundwater "investigations and remedial activities that may be required" by the water board at $3,150,000.

## IV. Additional Testimony and Evidence

### A. *Testimony of County's Persons Most Qualified to Testify*

Steven Thomas Rhodes retired from County in or about 2022 as Division Manager for County's Department of Public Health (DPH), Environmental Health Division. From 2012 until 2020, he was responsible for supervising DPH's environment health specialists, and for responding to Tax Collector inquiries concerning known or suspected contamination of tax-defaulted properties.

Rhodes testified that, prior to the March 2014 tax sale, an employee from the Tax Collector's office sent him an e-mail requesting he advise whether any contamination

7.

issues were associated with properties slated for sale. Rhodes determined the subject property had ongoing contamination issues, a fact known to County since the 1990's. He then provided the Tax Collector's office a list in which the subject property was identified as having known or suspected contamination issues.[3]

Rhodes further testified that members of the public were free to contact his office and inquire about possible contamination of property within the county, that neither Hovannisian nor anyone affiliated with plaintiffs contacted him to inquire about the subject property, and that, had they contacted him, he would have informed them of the contamination issues affecting the property. He said members of the public can also find such information on the Internet at fresnohealthinspections.org, and that 109 documents concerning contamination of the subject property were available on the website at the time of the auction.

Manjit Dhaliwal was designated by County as its person most qualified to testify on the tax sale process and the tax sale of the subject property. At the time of his designation, Dhaliwal was a division chief for County's Tax Collection Division.

Dhaliwal explained that the Tax Collector's office is responsible for determining which properties are tax-defaulted and eligible for a tax sale. The Tax Collector then presents a list of those properties to the Board of Supervisors and seeks its approval to conduct the sale. Once the Board of Supervisors approves a tax sale, it does not get involved with determining which properties are going to be sold or the terms of the sale. Those issues are left up to the Tax Collector's office. Dhaliwal twice testified, however,

---

[3]    The list was not entered into evidence. Rhodes testified the list was attached to his e-mail response to the Tax Collector office's inquiry. That e-mail response was admitted into evidence and showed an Excel file had been attached to it with the title "cupa solid waste programs resou[r]ce list – for comparison to tax collectors sale of property 12-16-13.xlsx."

he had no knowledge whether the Board of Supervisors ever delegated responsibility for developing the Terms of Sale to the Tax Collector.

At trial, Dhaliwal was asked to review County's contract with Bid4Assets.com (Bid4Assets contract). Dhaliwal testified that, according to the contract, County was to provide Bid4Assets.com with certain information " 'to be included in the acknowledgment language.' " He confirmed his understanding that the contamination disclosure provision was not language required by law. When asked who made the decision to use the contamination disclosure provision, Dhaliwal responded, " 'It appears that we received the terms of sale possibly from Kern or Kings County, a different county, and kind of just incorporated those in the first year that the County was going to do [a] tax sale.' "

Dhaliwal said County was aware of contamination issues pertaining to the subject property prior to the tax sale and had known of those issues "at least for a few years before that."

Ultimately, the parties stipulated that the Tax Collector's office and the DPH knew prior to the tax sale that the subject property was contaminated, that the Terms of Sale for the auction contained the contamination disclosure provision, and that County failed to identify the property as contaminated.[4]

B.      **Testimony of Water Board's Senior Engineering Geologist**

Warren Gross, a senior engineering geologist employed by the water board, testified the water board has authority "to require the assessment and, as necessary, the corrective action or a cleanup of pollution" that impacts or threatens the state's groundwater, to "issue actual orders" to private property owners, and to "issue fines and penalties" in connection with matters under its jurisdiction. He explained that anyone in

---

[4]      County clarified it was not stipulating the Board of Supervisors knew the property was contaminated, or that the Terms of Sale established a valid contractual obligation on the part of County.

9.

the chain of title of contaminated real property "going back to the original release of chemicals or contaminants" is potentially responsible for investigating and remediating the contamination.

Gross testified the groundwater contamination under the subject property is the result of a commingling of plumes of contamination that likely emanated from the property's prior use as an auto parts business and a neighboring, upgradient property owned or operated by "Dow."[5]  He testified that, even when the release of contaminants has been abated, contaminated soil may continue to pose a threat to underlying groundwater.  He acknowledged that Moore Twining had completed a plan for soil vapor extraction.  However, the water board had not yet determined whether further soil remediation would be required and there was still a "need for assessment and appropriate corrective action of groundwater."

According to Gross, any prospective purchaser of property can contact the water board to determine whether the property has contamination issues, and the water board will advise them.  Moreover, the water board has a public website called Geotracker,[6] which provides information about contaminated properties, and which contained information concerning contamination of the subject property since approximately 2007.

### C.     *Testimony of Plaintiffs' Expert Geologist/Environmental Consultant*

Keith Mayes, a professional geologist and environmental consultant employed by Moore Twining, testified Hovannisian hired his firm to perform soil remediation services under the direction of the water board.  He testified that, on May 6, 2022, Moore Twining prepared a report to the water board recommending soil remediation activities be

---

[5]     The reference to "Dow" was not clarified by Gross.  We observe that County filed a cross-complaint for indemnity and contribution against Dow International Holdings Company, but it dismissed the cross-complaint without prejudice.

[6]     Https://Geotracker.waterboards.ca.gov., archived at <https://perma.cc/26CP-6QUQ>.

terminated and no further action be conducted at the site. If the recommendations are accepted, Mayes understood the water board will then require an investigation of the groundwater—i.e., the installation of monitoring wells on the subject property and downgradient properties. He said it is also possible the water board may require groundwater remediation efforts after the groundwater investigation concludes, which he described as "crazy expensive." He said Moore Twining argued the water board should look to "Dow" to pursue future investigation and remediation efforts, if any are required. At the time of trial, the water board had not yet responded to Moore Twining's recommendations.

### D. *Testimony of County's Division Manager of DPH's Environmental Health Division*

Vincent Mendes, a division manager for DPH's Environmental Health Division (EHD), testified that, in or around 2010, the Hovannisian family purchased property that was the subject of a 2009 EHD investigation involving a methamphetamine laboratory. The EHD had posted a warning at the property stating it was "unfit for human occupancy and that there is contamination from toxic sources." The new property owners cleaned up the site and the EHD investigation was closed. The relevance of Mendes's testimony was not discussed by the parties.

## V. Procedural Background

### A. *Plaintiffs File Suit and, after a Round of Demurrers, the Trial Court Enters a Judgment of Dismissal*

On June 26, 2015, shortly after County rejected plaintiffs' government claim and prior to plaintiffs engaging the services of Moore Twining, plaintiffs filed their original complaint against County for breach of a written contract. Plaintiffs amended their complaint on July 7, 2015. County demurred and the trial court sustained the demurrer with leave to amend.

On October 5, 2015, plaintiffs filed a second amended complaint for breach of contract and County again demurred. On December 28, 2015, the trial court sustained County's demurrer without leave to amend. The court, relying on section 3692.3 and other authority, determined plaintiffs had taken the property "as is" and County was "immune from liability for any patent or latent conditions of the property sold at a tax sale, whether known or unknown." The court concluded counties have no contractual liability associated with a tax sale, aggrieved purchasers at a tax sale are limited to statutory remedies, and "recovery under [a breach of contract theory] is unsupported by statute or case law."

On January 14, 2016, the trial court entered a judgment of dismissal against plaintiffs.

### B.   *Plaintiffs Successfully Appeal the Judgment of Dismissal*

On March 1, 2016, plaintiffs appealed the judgment of dismissal. On February 27, 2018, this court reversed the judgment in a nonpublished opinion. (*JHS Family Limited Partnership v. County of Fresno* (Feb. 27, 2018, F073369) [nonpub. opn.] (*JHS Family Limited Partnership I*). In this appeal, plaintiffs argue the law of the case doctrine applies to this court's opinion in *JHS Family Limited Partnership I*. We revisit this issue in the "DISCUSSION" section below.

### C.   *Proceedings Following Resolution of* JHS Family Limited Partnership I

After *JHS Family Limited Partnership I* was decided, the Tax Collector recommended County unilaterally rescind the tax sale of the subject property. In an agenda item dated May 1, 2018, the Tax Collector recommended the Board of Supervisors conduct a hearing on rescinding the sale, make findings required by section 3731, and adopt a resolution approving the rescission.[7]

---

[7] Section 3731 provides, in part: "When a tax deed to a purchaser of property sold by the tax collector pursuant to this part is recorded and it is determined that the property should not have been sold, the sale may be rescinded by the board of supervisors with the

Plaintiffs moved ex parte to restrain County from unilaterally rescinding the tax sale, and from taking any other action to interfere with plaintiffs' possession of the subject property. Plaintiffs argued rescission would disrupt their ongoing business because they were using the property to warehouse supplies and materials, and they had incurred remediation expenses and expenses to repair the subject property, which County refused to reimburse. The trial court issued a temporary restraining order, after which the parties stipulated to a preliminary injunction and the filing of a third amended complaint to add a declaratory relief cause of action. As a result, the Board of Supervisors took no action on the Tax Collector's recommendation to rescind the tax sale.

Thereafter, plaintiffs filed a third amended complaint. On September 26, 2022, plaintiffs filed their governing fourth amended complaint.

On May 1, 2023, the matter went to trial before the trial court sitting without a jury. The parties rested their respective cases on the following day and then briefed their closing arguments to the court.

### D. *The Trial Court's Statement of Decision and Judgment*

On July 21, 2023, the trial court issued a proposed statement of decision. On August 4, 2023, County timely filed objections to the proposed statement of decision. (Cal. Rules of Court, rule 3.1590(g).)

On August 9, 2023, the trial court issued its Statement of Decision. The court found the Board of Supervisors "does not participate in drafting or approving the terms of sale used by the [T]ax [C]ollector" and that it has never done so "at any time since the inception of the sale of tax-delinquent properties in the County." It made additional findings that were subsequently incorporated into the judgment, as discussed below.

---

written consent of the county legal adviser and the purchaser" under specified circumstances. (§ 3731, subd. (a).) "If the written consent of the purchaser … is not obtained …, the sale may be rescinded by the board … pursuant to the circumstances specified in subdivision (a), …" after a duly noticed hearing. (*Id*. at subd. (b).)

On August 31, 2023, the trial court issued judgment in favor of plaintiffs and against County. In the judgment, the court stated it found, by a preponderance of evidence, that plaintiffs proved the following: "1. The County entered into a valid contract with [plaintiffs] for the sale of the subject property; [¶] 2. The contract included the terms of sale provided to Bid4Assets by the [T]ax [C]ollector; [¶] 3. The terms of sale include[d] a promise by the County to notify [plaintiffs] of any known or suspected contamination issues at the subject property; [¶] 4. [Plaintiffs] performed under the contract by paying the County $460,000; [¶] 5. Assuming *arguendo*, no contract was formed, the court finds the County … ratified the sale of the subject property, including the terms of sale, by refusing to rescind the sale, refund the $460,000, and insisting that [plaintiffs were] bound by [their] agreement to purchase the subject property; [¶] 6. The County knew of contamination issues at the subject property prior to entering into the contract with [plaintiffs]; [¶] 7. The County breached the contract by failing to notify [plaintiffs] of known or suspected contamination issues at the subject property; [¶] 8. [Plaintiffs have] been damaged as a result of the County's breach of contract; [¶] 9. The County is liable for any and all ongoing costs associated with remediation of contamination at the subject property as required by the water board or any other governmental agency for contamination existing at the time [plaintiffs] purchased the subject property; and [¶] [10]. [Plaintiffs are] the prevailing part[ies]."

The judgment awarded plaintiffs "$564,299.33 in general damages for remediation costs incurred up to the date of July 14, 2023 … and all allowable interest thereon." It further declared County "liable to [p]laintiffs … for … ongoing costs associated with remediation of the subject property …," and awarded plaintiffs costs and interest to be determined by the court.

Notice of entry of the judgment was served on September 6, 2023. County timely filed its notice of appeal on October 31, 2023.

14.

### E. *Amicus Curiae*

We granted the California State Association of Counties' (amicus curiae)[8] application to file an amicus brief in this matter and have received its briefing and plaintiffs' response thereto. Amicus curiae also filed a motion for judicial notice, and plaintiffs opposed the motion. We deferred ruling on the motion pending consideration of this appeal on the merits and now deny the motion.[9]

---

[8] Amicus curiae states it "is a non-profit corporation that exists to serve as the effective advocate and unified voice of California's 58 Counties."

[9] Amicus curiae moved this court to judicially notice five documents: (1) an abstract of property characteristics prepared in 2024 by the chief appraiser of the Fresno County Assessor-Recorder's Office that shows "industrially-zoned warehouse properties developed with warehouses of at least 50,000 sq. ft. in floor area and located with ½ mile of the [subject property]" as well as land and improvement values used to obtain an assessed value for the properties; (2) "a Google Earth aerial image showing the location of each of the properties listed in the … abstract"; (3) a printout of a DPH report listing documents purportedly on file prior to 2014 showing the subject property was contaminated; (4) a similar report from the Department of Toxic Substances Control; and (5) a similar report from the Geotracker website. Amicus curiae argues the documents are relevant "to inform the Court of the relative assessed value of the [subject property] … with comparable nearby warehouse properties to provide context for plaintiff[s'] decision not to attempt to rescind the tax sale deed," and to show information concerning contamination of the subject property that was available to the public prior to the tax sale "to address the question of whether Plaintiffs' reliance upon the [contamination disclosure provision] was reasonable and justified."

Items (1) and (2) are not relevant to the issues on appeal. The information relates to 2024—not 2014 when the tax sale occurred. Similar information for 2014 could have been developed and offered at trial but was not. Moreover, the value of these other warehouse properties may reasonably be subject to dispute and, therefore, is not a proper subject for judicial notice. (Evid. Code, §§ 451, subd. (f), 452, subds. (g) & (h).) Amicus curiae says the information demonstrates why plaintiffs wanted to keep the subject property rather than seek rescission—suggesting the value plaintiffs obtained made it worthwhile for them to take a gambit on a suit for breach of contract, rather than seek rescission. But Hovannisian testified, without contradiction, that plaintiffs did not pursue rescission because they understood they would only recoup the purchase price and not funds expended improving the property and investigating and remediating contamination on the property. It is not proper for us to judicially notice such materials in order to cast

15.

# DISCUSSION

County's challenge to the judgment largely centers around its contention the contamination disclosure provision was not a valid, enforceable contractual obligation. County argues, "Government officials and employees cannot bind public entities to contracts unless they are expressly authorized to do so[,]" and the Tax Collector lacked such authority to include the contamination disclosure provision in the Terms of Sale. County also argues it never ratified the contamination disclosure provision or the Terms of Sale. Finally, County argues that, if we uphold the finding that a contractual obligation was formed and breached, the damages awarded to plaintiffs were excessive because they were not foreseeable and exceeded recoverable damages under Civil Code section 3306.[10]

## I. The Judgment Is Appealable

Plaintiffs' governing complaint contained three causes of action. The first cause of action was for breach of a written contract. The second was for declaratory relief, seeking a judicial declaration that County was not entitled to rescission. The third was for declaratory relief, seeking a judicial declaration that plaintiffs were entitled to reimbursement by County of all costs (including future costs) to investigate and remediate contamination on the subject property. The judgment expressly resolved the

---

doubt on Hovannisian's credibility and retry factual issues. (See *Dean W. Knight & Sons, Inc. v. First Western Bank & Trust Co*. (1978) 84 Cal.App.3d 560, 567–568.)

As to the information contained in items (3) through (5), it was available at the time of trial and, if believed relevant, should have been offered into evidence by County. Moreover, it is cumulative because undisputed testimony at trial established that substantial information concerning contamination was known to various County departments and available to the public from DPH and Geotracker, which would have included information from the Department of Toxic Substances Control.

[10] County asserts additional challenges to the judgment that we conclude herein are barred by the law of the case doctrine. Those challenges are discussed in part IV of the DISCUSSION section of this opinion.

first and third causes of action.  The second cause of action was not expressly addressed but was rendered moot when the trial court ruled the tax sale contract with the Terms of Sale was valid and enforceable and found in plaintiffs' favor on the other causes of action.  Under these circumstances, " 'there was nothing further in the nature of judicial action on the part of the court essential to a final determination,' " the judgment is final, and the matter is appealable.  (*Belio v. Panorama Optics, Inc.* (1995) 33 Cal.App.4th 1096, 1102; *Areso v. CarMax, Inc.* (2011) 195 Cal.App.4th 996, 1001–1002.)

## II.     Standard of Review

" 'In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo.  [Citation.]  We apply a substantial evidence standard of review to the trial court's findings of fact.  [Citation.]  Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings.' "  (*Lopez v. La Casa de Las Madres* (2023) 89 Cal.App.5th 365, 378.)

" 'Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed.  But if the material facts are certain or undisputed, the existence of a contract is a question for the court to decide.' "  (*HM DG, Inc. v. Amini* (2013) 219 Cal.App.4th 1100, 1109.)  Where the question before us "requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then … the question should be classified as one of law and reviewed de novo."  (*McGhan Medical Corp. v. Superior Court* (1992) 11 Cal.App.4th 804, 810.)

County largely accepts the trial court's findings of fact—a notable exception being the finding that "[o]n March 26, 2015, [plaintiffs] served the County with a formal demand to rescind the purchase[,]" which County refused.  Consequently, it argues this

17.

case, and the determination that the contamination disclosure provision constituted a contractual obligation on the part of County, should be reviewed de novo. Plaintiffs do not disagree—subject to the caveat that, if County does challenge any findings, those findings should be reviewed for substantial evidence.

**III.  Substantial Evidence Does Not Support the Finding that Plaintiffs Made a Demand for Recission, or that County Refused Such a Demand**

The trial court's finding that plaintiffs made a formal demand to rescind the tax sale was premised on plaintiffs' March 26, 2015 government claim. Plaintiffs alleged (several times) in the claim that County breached its contractual obligation to make disclosures pursuant to the contamination disclosure provision. Plaintiffs denominated the claim as a "Claim for Damages" in both the reference line and in its body; therein stated they are being required to remediate contamination on the subject property at an estimated cost of "at least $500,000, and likely more"; and stated they paid a winning bid of $460,000 for the property. The claim then states: "The amount of the claim being summarized hereby exceeds $10,000. The claim would not be a limited civil case."

Although a claim for damages is not inconsistent with a claim for relief based on rescission (Civ. Code., § 1692), nothing in the language of the government claim suggests plaintiffs were seeking rescission. In fact, plaintiffs acknowledge in their respondent's brief "the fact that the March 2015 claim demand did not request rescission." Notably, plaintiffs have not, at any time, sought rescission in this litigation despite having filed their original complaint only 24 days after their government claim was rejected. Aside from the declaratory relief causes of action added to their third and fourth amended complaints, the only cause of action alleged by plaintiffs has been for breach of contract.

We agree with County that the government claim was not a demand for rescission and, therefore, the rejection of the government claim by the Board of Supervisors cannot be considered a refusal of a demand for rescission.

18.

**IV.** ***JHS Family Limited Partnership I* and the Law of the Case Doctrine**

In a typical tax sale, a county enjoys certain protections from liability. In particular, section 3692.3 provides that all property sold under the tax sale statutes "is offered and sold as is" and that a county is not liable for "known or unknown conditions" of the property. (§ 3692.3, subds. (a), (b)(1).)

However, in *JHS Family Limited Partnership I* this court wrote: "While caveat emptor applies to tax sales and generally precludes a purchaser from relying on general contract principles, there is an additional element in this case. [T]he County made a specific express promise to identify possibly contaminated properties that it was aware of. The County was not statutorily required to include [the] disclosure provision in the terms of sale. Rather, the County voluntarily made this representation." (*JHS Family Limited Partnership I*, *supra*, F073369, at pp. 6–7.) We determined the contamination disclosure provision was a "specific representation [that] conflicts with the general 'sold as is' provision. In such a situation, the specific provision controls." (*Id*. at p. 8.)

We further wrote: "[Plaintiffs'] [second amended] complaint alleges the County was aware of claims regarding known or suspected contaminants located on the subject property but did not give notice of this contamination. [Plaintiffs] further allege that they relied on this disclosure provision in making their bid. Since we are reviewing the sustaining of a demurrer, we must accept this allegation as true. Thus, the County failed to fulfill its specific promise to identify contaminated properties. [¶] [T]he statutory scheme provides no warranty of the validity or regularity of the proceedings. [Citation.] However, by promising to disclose contamination as part of the bid process, the County undertook a separate contractual obligation beyond the tax sale procedure. The County is not immune from liability for breach of contract. [Citation.] Because this obligation was in addition to the standard terms and conditions of a tax sale, it falls outside the tax sale immunities. Therefore, the County subjected itself to liability for breach based on contract principles." (*JHS Family Limited Partnership I*, *supra*, F073369, at p. 7.)

Plaintiffs contend "[t]his court's prior determinations rejecting [County's] asserted legal defenses to the [plaintiffs'] breach of contract and damage claims are conclusive" under the law of the case doctrine. County responds by arguing the *JHS Family Limited Partnership I* decision was premised on express allegations the court was required to assume were true, namely, that *County had actually entered into a valid contractual obligation* to disclose known or suspected contamination on the subject property (as opposed to the Tax Collector inserting the contamination disclosure provision into the Terms of Sale without requisite authority, which County contends would not rise to the level of an enforceable contractual obligation).

" ' "The doctrine of 'law of the case' deals with the effect of the *first appellate decision* on the subsequent *retrial or appeal*: The decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case." [Citation.]' [Citation.] 'Generally, the doctrine … does not extend to points of law which might have been but were not presented and determined in the prior appeal. [Citation.] As an exception to the general rule, the doctrine is … held applicable to questions not expressly decided but implicitly decided because they were essential to the decision on the prior appeal.' " (*Leider v. Lewis* (2017) 2 Cal.5th 1121, 1127.) The doctrine may be applied where, as here, the prior appeal is from a judgment on demurrer. (*Bergman v. Drum* (2005) 129 Cal.App.4th 11, 15, fn. 3.)

"As its name suggests, the doctrine applies only to an appellate court's decision on a question of law; it does not apply to questions of fact." (*People v. Barragan* (2004) 32 Cal.4th 236, 246.) "In other words, although an appellate court's legal determination constitutes the law of the case, 'upon a retrial … that law must be applied by the trial court to the evidence presented upon the second trial.' [Citation.] Thus, during subsequent proceedings in the same case, *an appellate court's binding legal determination 'controls the outcome only if the evidence on retrial or rehearing of an*

*issue is substantially the same as that upon which the appellate ruling was based*. [Citations.]' [Citation.] Where, on remand, 'there is a substantial difference in the evidence to which the [announced] principle of law is applied, … the [doctrine] may not be invoked.' " (*Ibid*., italics added.)

County correctly asserts plaintiffs' allegations were not actually proven in the demurrer proceedings. (See *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 47 [" '[i]t is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct' "].) Thus, County argues the decision in the prior appeal merely "allowed [plaintiffs'] action to proceed so that they would have an opportunity to prove … a 'separate contractual obligation beyond the tax sale procedure.' "

Both parties make valid points. We conclude several arguments advanced by County in this appeal are precluded by the law of the case doctrine. Specifically, County argues a tax sale "is structured by statute, not by contract" and case law that states "a tax sale constitutes a contract" (*Craland, Inc. v. State of California* (1989) 214 Cal.App.3d 1400, 1405) is mere dicta, ill-considered and should not be given precedential effect. Although not entirely clear, County seemingly argues it was precluded by statute from creating a contractual obligation in connection with the tax sale, and that a purchaser at a tax sale is limited to statutory remedies. Relatedly, County argues it is expressly shielded from liability by virtue of section 3692.3.

The foregoing arguments were advanced by County in the prior appeal and were decided against County. (*JHS Family Limited Partnership I*, *supra*, F073369, at pp. 6–9.) Thus, County may not now argue (1) it was unable, as a matter of law, to enter into a contractual obligation such as that provided by the contamination disclosure provision; (2) it is statutorily immune from liability by virtue of section 3692.3; and (3) that contractual remedies are unavailable in the event we decide a valid contractual obligation has been breached. However, County is correct that the decision in *JHS Family Limited*

21.

*Partnership I* did not purport to make a legal determination that County was *actually* subject to a valid contractual obligation. Rather, the allegation that County had validly entered into the contract was assumed true for purposes of reviewing the trial court's ruling on demurrer.[11] Consequently, County is not barred from arguing it did not actually enter into a valid contractual obligation.

## V.      County's Power to Contract and Limitations on that Power

"A county is a body corporate and politic, has the powers specified in this title and such others necessarily implied from those expressed." (Gov. Code, § 23003.) Among those powers is the power to contract. (*Id*., at § 23004, subd. (c).)

"A county may exercise its powers *only* through the board of supervisors or through agents and officers acting under authority of the board or authority conferred by law." (Gov. Code, § 23005, italics added.) The Legislature's use of the word "only" in the statute indicates an intent that the methods set forth in the statute by which a county may act are exclusive. No other methods are authorized. Thus, by statute, there are only three methods by which County may act: (1) a direct action by the Board of Supervisors; (2) the action of an agent or officer who has been duly authorized to take such action by the Board; or (3) the action of an agent or officer whose authority to so act has been conferred by law. "Any contract, authorization, allowance, payment, or liability to pay, made or attempted to be made in violation of law, is void, and shall not be the foundation or basis of a claim against the treasury of any county." (*Id*., at § 23006.)

The law is well settled that " 'when by statute the power of the board or municipality to make a contract is limited to a certain prescribed method of doing so and any other method of doing it is expressly or impliedly prohibited, *no implied liability can arise for benefits received under a contract made in violation of the particularly*

---

[11] The allegations of plaintiffs' second amended complaint did not describe the process by which County allegedly approved the tax sale, the scope of that approval, or details surrounding that approval.

22.

*prescribed statutory mode.* Under such circumstances the express contract attempted to be made is not invalid merely by reason of some irregularity or some invalidity in the exercise of a general power to contract, but *the contract is void because the statute prescribes the only method in which a valid contract can be made, and the adoption of the prescribed mode is a jurisdictional prerequisite to the exercise of the power to contract* at all and can be exercised in no other manner so as to incur any liability on the part of the municipality. Where the statute prescribes the only mode by which the power to contract shall be exercised the *mode* is the *measure* of the power. A contract made otherwise than as so prescribed is not binding or obligatory as a contract and the doctrine of implied liability has no application in such cases.' " (*Miller v. McKinnon* (1942) 20 Cal.2d 83, 91–92 (*Miller*) [italics added to first two italicized phrases, other italics in original]; *Reams v. Cooley* (1915) 171 Cal. 150, 153–154 (*Reams*); *Zottman v. City and County of San Francisco* (1862) 20 Cal. 96, 102 (*Zottman*); *Torres v. City of Montebello* (2015) 234 Cal.App.4th 382, 394 (*Torres*); *Duffens v. Valenti* (2008) 161 Cal.App.4th 434, 455*; South Bay Senior Housing Corp. v. City of Hawthorne* (1997) 56 Cal.App.4th 1231, 1235; *Santa Monica Unified Sch. Dist. v. Persh* (1970) 5 Cal.App.3d 945, 953–954.) "It is settled that a county is a creature of limited powers, having only those powers which are delegated to it by the Constitution or the Legislature. And when a county acts … under authority derived from a statute, it must strictly follow the statutory provisions; …" (*Richter v. Board of Supervisors of Sacramento County* (1968) 259 Cal.App.2d 99, 105.)

### A. *The Contamination Disclosure Provision Was Not Approved by a Direct Action of the Board of Supervisors*

By statute, "[e]ach county shall have a board of supervisors consisting of five members." (Gov. Code, § 25000, subd. (a).) "A majority of the members of the board constitute a quorum for the transaction of business. *No act of the board shall be valid or binding unless a majority of all the members concur therein.*" (*Id.*, at § 25005, italics

23.

added.)  Thus, a quorum of at least three members must be in attendance in order for the board of supervisors to transact business, and at least three members of the quorum must concur in any action taken by it.  (*County of Sonoma v. Superior Court* (2009) 173 Cal.App.4th 322, 345–346.)  Generally, the business of a board of supervisors must be conducted at a duly noticed meeting.  (Gov. Code, § 54952.2, former subds. (a), (b)(1), added by Stats. 2008, ch. 63, § 3.  Gov. Code, § 54952.2 was updated by Stats. 2020, ch. 89, § 1, eff. Jan. 1, 2021, without change to subds. (a) & (b)(1).)

County concedes no resolution or ordinance was required to establish a valid contractual obligation in this matter.  However, it relies on *Williamson v. Los Angeles County Flood Control Dist.* (1941) 42 Cal.App.2d 622 for the proposition that, in order to establish a valid, express contract with the Board of Supervisors, there must be some evidence that " 'a majority of all the members concur[red]' " in the contract (*id*. at p. 626), or stated another way, that there was a "meeting of the minds" of a majority of board members.  County contends there is no evidence of a meeting of the minds of the Board members concerning the Terms of Sale.

Plaintiffs contend the evidence "establishes the [T]ax [C]ollector had the express specific authority by [the] [B]oard [of Supervisors] and law to conduct [a] tax sale of the [subject property]," "it is undisputed that the Board … also delegated to the tax department the responsibility to set forth the specific terms of the tax lien sale," County had been including the contamination disclosure provision in its tax sale terms "for years," and the Board never advised the Tax Collector that the provision was improper or unauthorized.

Plaintiffs cite to the testimony of Dhaliwal, which established or asserted (1) certain details of the Bid4Assets contract; (2) the Terms of Sale that were provided to Bid4Assets.com; (3) the contamination disclosure provision was not required by law; (4) County made the decision to notify sellers it would make the disclosure; (5) the contamination disclosure provision was "received" from another county and

"incorporated" into the Terms of Sale used by County; and (6) the tax collection department determines the Terms of Sale and the Board of Supervisors is not involved in those details.

As mentioned, Dhaliwal twice testified he had no knowledge of whether the Board of Supervisors ever delegated to the Tax Collector responsibility for developing the Terms of Sale. Thus, when Dhaliwal ascribes certain conduct or decisions to "County," the only fair inference is that Dhaliwal was referring to the County without regard to whether such conduct or decisions were approved by the Board, or by an agent with properly delegated authority, or through authority conferred by law.

Importantly, the trial court expressly found the Board of Supervisors "does not participate in drafting *or approving* the terms of sale used by the [T]ax [C]ollector" and that it has never done so "at any time since the inception of the sale of tax-delinquent properties in the County." (Italics added.) In fact, neither party cites to any evidence demonstrating the Board was aware, prior to receiving the government claim, that the Tax Collector was using the contamination disclosure provision in terms set for County tax sales, and our review of the record does not reveal any such evidence.

We conclude the evidence does not support a determination that the contamination disclosure provision was approved by direct action of the Board of Supervisors. As the trial court found, the Board had no role in approving the Terms of Sale.

## B. *Use of the Contamination Disclosure Provision Was Not Within the Authority Conferred on the Tax Collector by Law*

The trial court concluded "…[Section] 3691 grants the tax collector the power to sell tax-defaulted properties. Although the Board of Supervisors must first approve the list of tax-delinquent properties to be sold, nothing in the language of … [sections] 3691 or 3694 restricts the tax collector's power to sell property. Nor does the Revenue and Taxation Code require the tax collector to obtain the Board's approval of the terms of sale used by the tax collector in the exercise of its power to sell tax-delinquent properties."

25.

We disagree that the Tax Collector's statutory authority to sell tax-defaulted property is unrestricted by the Revenue and Taxation Code.

Section 3691 provides, in part: "after the property has become tax defaulted, the tax collector shall have the power to sell and *shall attempt to sell in accordance with Section 3692* all or any portion of tax-defaulted property that has not been redeemed .…" (§ 3691, subd. (a)(1)(A), italics added.) Section 3692 provides, in part: "The tax collector *shall attempt to sell tax-defaulted property, as provided in this chapter* [i.e., sections 3691 through 3731.1] .…" (§ 3692, subd. (a), italics added.) Thus, the Tax Collector's authority to sell tax-defaulted property is circumscribed by the tax sale statutes.

One restriction on the Tax Collector's statutory authority to sell tax-defaulted property is contained in section 3692.3: "(a) All property sold under this chapter is offered and sold as is. [¶] (b) The state, the county, and an employee of these entities acting in the employee's official capacity in preparing, conducting, and executing a sale of property under this chapter, are not liable for any of the following: [¶] (1) Known or unknown conditions of this property, including, but not limited to, errors in the assessor's records pertaining to improvement of the property." (§ 3692.3, subds. (a), (b)(1).)

As mentioned, in *JHS Family Limited Partnership I*, we determined the contamination disclosure provision was a "specific representation [that] conflicts with the general 'sold as is' provision. In such a situation, the specific provision controls." (*JHS Family Limited Partnership I*, *supra*, F073369, at p. 8.) We further determined (1) there was no statutory requirement to include the contamination disclosure provision in the Terms of Sale; (2) assuming plaintiffs' allegations are true, "the County undertook a separate specific contractual obligation beyond the tax sale procedure"; and (3) as a result, "the County subjected itself to liability for breach based on contract principles." (*Id.* at pp. 7, 9.)

26.

The Tax Collector did not act within the scope of his authority under the tax sale statutes. By including the contamination disclosure provision in the Terms of Sale, the Tax Collector failed to offer and sell the subject property "as is" and thereby exposed County to potential liability for breach of contract in contravention of section 3692.3, subdivision (a). Thus, the Tax Collector went beyond her authority to conduct the sale "in accordance with Section 3692," which required her to "attempt to sell tax-defaulted property, as provided in [the tax sale statutes]." (§ 3692, subd. (a).)

We conclude the authority conferred upon the Tax Collector by law to conduct a tax sale did not include authority to utilize the contamination disclosure provision in the Terms of Sale.

C.     ***The Tax Collector's Use of the Contamination Disclosure Provision Was Not Pursuant to Any Lawful Delegated Authority***

Government Code section 23005 allows a board of supervisors to delegate certain powers to agents and officers. (*Golightly v. Molina* (2014) 229 Cal.App.4th 1501, 1515.) But there are limits to a board of supervisor's power of delegation. A board of supervisors may not delegate to another " ' "unrestricted authority to make fundamental policy decisions." ' " (*Samples v. Brown* (2007) 146 Cal.App.4th 787, 804 (*Samples*); *People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 632 (*Sun Pacific Farming*).) A delegation of authority is also unlawful if it fails to provide the delegate with " 'adequate direction for the implementation of that policy.' " (*Sun Pacific Farming*, at p. 633.) " 'Thus, a delegation of authority must be accompanied by safeguards which [e]nsure that the delegatee does not act arbitrarily.' " (*Ibid.*)

County argues there was no *actual* delegation of authority to the Tax Collector to enter into a contract that included the contamination disclosure provision. In contrast, plaintiffs contend "[t]he Board of Supervisors approved the sale of the [subject property] pursuant to the recommendation made by the [Tax Collector] and then authorized the

27.

[Tax Collector] to determine the specific terms of sale and to proceed with such sales." County has the better argument.

The only evidence cited by plaintiffs in support of their argument the Board of Supervisors delegated authority to the Tax Collector to establish the Terms of Sale is the testimony of Dhaliwal. However, as mentioned, Dhaliwal expressly stated he had no knowledge of whether the Board ever delegated the responsibility for developing the Terms of Sale to the Tax Collector. Plaintiffs' delegation argument is further undercut by the tax sale approval in which the Board expressly directed the Tax Collector to "sell the properties … *in accordance with Chapter 7 of Part 6 of Division 1 of the California Revenue and Taxation Code*"—i.e., the tax sale statutes. (Italics added.) Despite this directive, the Tax Collector did not adhere to, and in fact, went beyond, her authority as set forth in those statutes.

Plaintiffs next argue "the Board is presumed to know of all that the [T]ax [C]ollector is aware, including the Terms of Sale." They cite to *van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 572 for the proposition that "[w]ithin the scope of his authority, 'notice to an agent is notice to the principal.…' " However, "[n]o government, whether state or local, is bound to any extent by an officer's acts in excess of his authority. [Citation.] [¶] *One who deals with [a] public officer stands presumptively charged with a full knowledge of that officer's powers, and is bound at his peril to ascertain the extent of his powers to bind the government* for which he is an officer, and any act of an officer to be valid must find express authority in the law or be necessarily incidental to a power expressly granted." (*Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1563–1564 (*Horsemen's*), italics added; *Torres*, *supra*, 234 Cal.App.4th at p. 399; *Katsura v. City of San Buenaventura* (2007) 155 Cal.App.4th 104, 109; *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 465; *Burchett v. City of Newport Beach* (1995) 33 Cal.App.4th 1472, 1479; *Bear River Sand & Gravel Corp. v.*

28.

*Placer County* (1953) 118 Cal.App.2d 684, 690.) Thus, it was incumbent upon plaintiffs to determine whether the Tax Collector had the requisite authority to bind County to a contractual obligation in contravention of the tax sale statutes. There is no evidence in the record that plaintiffs made such an inquiry. Had plaintiffs done so, they would have found no evidence to support an exercise of such authority by the Tax Collector. And, equally important, they would have determined with reasonable certainty that the Tax Collector *lacked* such authority by examining the tax sale approval issued by the Board of Supervisors.

We conclude the Board of Supervisors did not delegate to the Tax Collector authority to include the contamination disclosure provision in the Terms of Sale.[12]

### D.      *The Board of Supervisors Did Not Ratify the Tax Collector's Use of the Contamination Disclosure Provision*

County contends the trial court erred when it found that, even if no valid contract was initially formed, County ratified the sale. County argues ratification may only occur

---

[12]     County also contends "[t]here is no evidence … that the Board [of Supervisors] ever considered, much less resolved, the 'truly fundamental issue' here, namely whether the County should effectively warrant, by potential omission of County staff, the condition of tax-defaulted property, and put the County at risk of reach and the public fisc at risk of a judgment for the costs to remediate contamination …." County argues there is no evidence the Board of Supervisors (1) budgeted funds to cover the risk; (2) considered or determined criteria for the Tax Collector to enter into contractual obligations on behalf of the Board; or (3) "established any process to mitigate the possibility that low-level County staff" might risk the public fisc upon a failure to identify contaminated property in a tax sale.

Even if the evidence supported plaintiffs' delegation argument, which it does not, we find merit in County's assertion that the Tax Collector's unilateral decision to add the contamination disclosure provision to the Terms of Sale—a decision that exposed County to millions of dollars in potential liability for costs of investigating and remediating contamination on property sold at a tax sale in contravention of the tax sale statutes—was a fundamental policy decision the Board of Supervisors could not lawfully delegate to the Tax Collector absent adequate safeguards. (See *Samples*, *supra*, 146 Cal.App.4th at p. 804; *Sun Pacific Farming*, *supra*, 77 Cal.App.4th at p. 632.)

if it qualifies as a County action under one of the three methods prescribed in Government Code section 23005 and there is no evidence any of these three methods were undertaken.

Undoubtedly, the Board of Supervisors had the power to ratify the tax sale and the Terms of Sale. (See *People ex rel. Alexander v. Swift* (1866) 31 Cal. 26, 28 [the "subsequent ratification [of a contract] by the Board, within their powers, and according to the method of contracting pointed out in the charter, bound the city as effectually as [contracting] in advance would have done"].) "A contract which is voidable solely for want of due consent, may be ratified by a subsequent consent." (Civ. Code, § 1588.)

With regard to ratification by a governmental entity, our state Supreme Court has stated, " 'a contract not made in the prescribed mode cannot be affirmed and ratified *in disregard of that mode* by any subsequent action of the corporate authorities …. [W]here authority to do a particular act can only be exercised in a particular form or mode, the ratification must follow such form or mode ….' " (*Los Angeles Dredging Co. v. Long Beach* (1930) 210 Cal. 348, 360, quoting *Zottman*, *supra*, 20 Cal. at p. 102.)

Plaintiffs rely on *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67 (*Rakestraw*) for the proposition that "[a] purported agent's act may be adopted … based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.' " (*Id*. at p. 73.) Plaintiffs argue, and the court found, County impliedly ratified the Terms of Sale when it "refused" to rescind the tax sale transaction and return the $460,000 purchase price after it was notified County had breached the contamination disclosure provision.

*Rakestraw* involved a dispute between private parties. (*Rakestraw*, *supra*, 8 Cal.3d at p. 70.) Plaintiffs have not cited any cases where a governmental entity's contractual liability was implied by conduct that failed to adhere to prescribed and exclusive modes for governmental contracting. California Supreme Court authority

30.

would seem to preclude such liability. (*Miller*, *supra*, 20 Cal.2d at p. 91 ["no implied liability … under a contract made in violation of the particularly prescribed statutory mode"]; *Reams*, *supra*, 171 Cal. at p. 154 [same].) Notwithstanding, assuming County liability may be premised on such conduct, we consider whether County's conduct rose to the level of ratification.

In *Allied Mutual Ins. Co. v. Webb* (2001) 91 Cal.App.4th 1190 (*Allied Mutual*), this court held "an agent's originally unauthorized act may be ratified by implication *where the only reasonable interpretation of the principal's conduct is consistent with approval or adoption*." (*Id.* at p. 1194, italics added.) "A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.' [Citations.] It is essential, however, that the act of adoption be truly voluntary in character. Moreover, there can be no adoption if the act, although voluntary, is done only because the purported principal is obligated to minimize his losses caused by the agent's wrongful act [citation], or because of duress or misrepresentation by the agent." (*Rakestraw*, *supra*, 8 Cal.3d at p. 73.)

Plaintiffs contend County refused to rescind the tax sale when Hovannisian called "Natalie" at the Tax Collectors to inquire about possible rescission and was told it was not an option and that all sales are final. We do not view this testimony as establishing a valid "refusal" to rescind on part of County. No evidence was provided as to Natalie's name or authority within the Tax Collector's office to refuse rescission. Moreover, authority to rescind a tax sale is vested, by statute, in the Board of Supervisors—not the Tax Collector or individuals within the Tax Collector's office. (§ 3731, subds. (a), (b).)

Plaintiffs next contend County refused to rescind the tax sale by rejecting their government claim. But, as we have previously determined, the government claim did not

31.

constitute a demand for rescission and County's rejection of the claim cannot be characterized as a refusal to rescind the tax sale.

Notwithstanding, we consider whether County's conduct would otherwise meet the test for ratification and conclude it does not for several reasons. As we have determined, the Board of Supervisors was rejecting a claim for damages—not a request for rescission. Yet, the only remedy provided in the tax sale statutes for an improper tax sale is rescission accompanied by a refund of the purchase price with interest thereon. (§ 3731, subd. (c).) Similarly, when a court declares a tax deed void, a purchaser is only entitled to "a refund … of the amount paid as the purchase price in excess of the amount for which he or she has been reimbursed for taxes, penalties, and costs." (§ 3729, subd. (a).) There is no provision for contract damages in the tax sale statutes. By refusing plaintiffs' government claim, the Board was arguably doing nothing more than relying on the typical unavailability of contract damages in connection with a tax sale. Moreover, given the limitations placed on the Tax Collector's authority in the Board's tax sale approval—i.e., to conduct the sale in accordance with the tax sale statutes, which provide all tax-defaulted properties are "offered and sold as is" and that a county conducting such a sale is "not liable for" "[k]nown or unknown conditions" of the subject property (§ 3692.3, subds. (a), (b)(1))—the Board may have reasonably believed it had no liability for breach of contract.

Ratification may only be found where the "only reasonable interpretation of the principal's conduct is consistent with approval or adoption." (*Allied Mutual*, *supra*, 91 Cal.App.4th at p. 1194; *Rakestraw*, *supra*, 8 Cal.3d at p. 73.) There are reasonable interpretations of the Board of Supervisor's conduct in rejecting plaintiffs' government claim that do not evince an intent to approve or adopt the Tax Collector's use of the contamination disclosure provision in the Terms of Sale. Notably, once this court issued its decision in *JHS Family Limited Partnership I*, which demonstrated that County could not rely on the liability protections of the tax sale statutes, the Tax Collector promptly

32.

sought to have the Board consider whether to unilaterally rescind the tax sale. As mentioned, County was enjoined from rescinding the sale and, as a result, the Board took no action on the Tax Collector's rescission recommendation.

Plaintiffs' reliance on *Sittig v. Raney* (1921) 53 Cal.App. 709 (*Sittig*) is unavailing. In *Sittig*, the plaintiff furnished materials ordered by a single member of the board of supervisors. (*Id*. at pp. 710–711.) When the plaintiff filed a claim for payment, the board considered and allowed the claim and ordered it be paid. (*Id*. at p. 711.) The auditor refused to pay the claim alleging the claim form did not adhere to statutory requirements. (*Id*. at pp. 719–720.) The plaintiff petitioned for a writ of mandate, which was granted and upheld on appeal. (*Id*. at pp. 710, 724.) The appellate court wrote: "[T]he allowance of [the] claim … by the board of supervisors … amounted to a recognition of the correctness of the claim, and therefore a ratification of the act of the road commissioner resulting in the creation of the liability upon which the claim is founded." (*Id.* at p. 721.)

Here, unlike the facts in *Sittig*, the Board of Supervisors did not approve plaintiffs' government claim. Had the Board approved the claim, plaintiffs' argument would have greater appeal. (See *Sittig*, *supra*, 53 Cal.App. at p. 721.) However, it would be incongruent for us to conclude that both approval *and* rejection of a government claim serves to ratify the transaction.

We conclude the Board of Supervisor's did not ratify the tax sale and Terms of Sale by any of the modes of power provided in section 23005 or by implication.

### E.     *The County Is Not Estopped to Deny the Validity of the Terms of Sale*

In their respondent's brief, plaintiffs argue "[t]he evidence also supports a finding of ostensible authority." In response, County contends it cannot be estopped from denying the validity of the Terms of Sale based on the ostensible or apparent authority of the Tax Collector.

"Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." (Civ. Code,

§ 2317.) "Ostensible authority is based on the principle of estoppel, and requires the essential elements of estoppel …. [Citation.] Ostensible authority must be based on the acts or declarations of the principal and not solely upon the agent's conduct." (*Taylor v. Roseville Toyota, Inc.* (2006) 138 Cal.App.4th 994, 1005 (*Taylor*).)

"The modern doctrine of equitable estoppel is a descendent of the ancient equity doctrine that 'if a representation be made to another who deals upon the faith of it, the former must make the representation good if he knew or was bound to know it to be false.' [Citations.] We have described the requirements for the application of equitable estoppel as follows: ' "Generally speaking, four elements must be present …: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." ' " (*Lentz v. McMahon* (1989) 49 Cal.3d 393, 398–399 (*Lentz*).)

Plaintiffs argue the Tax Collector's ostensible authority to include the contamination disclosure provision in the Terms of Sale is shown by the following facts: (1) for years, the Tax Collector had been including the provision in the Terms of Sale for tax sales; (2) the Board of Supervisors does not get involved in drafting the Terms of Sale; (3) the Board knew the Tax Collector drafts Terms of Sale for tax sales; (4) the Board delegated and authorized the Tax Collector to set the Terms of Sale; and (5) the Board never advised the Tax Collector that including the contamination disclosure provision in the Terms of Sale was improper or unauthorized.

Plaintiffs' ostensible authority argument suffers from several weaknesses. With regard to the first and fifth points above, there is no evidence in the record to suggest that, prior to receiving plaintiffs' government claim, the Board of Supervisors knew or was advised the Tax Collector was utilizing the contamination disclosure provision in its Terms of Sale. With regard to plaintiffs' third and fourth points, the tax sale approval

34.

issued by the Board set strict limits on the Tax Collector's authority to conduct the tax sale "in accordance with" the tax sale statutes. Yet, the Tax Collector exceeded this authority by including the contamination disclosure provision in the Terms of Sale and, in doing so, set terms that superseded the protections provided by section 3692.3. (*JHS Family Limited Partnership I*, *supra*, F073369, at p. 7.) Thus, the Board did not delegate such authority to the Tax Collector.

As previously stated: "*One who deals with [a] public officer stands presumptively charged with a full knowledge of that officer's powers, and is bound at his peril to ascertain the extent of his powers to bind the government* for which he is an officer, and any act of an officer to be valid must find express authority in the law or be necessarily incidental to a power expressly granted." (*Horsemen's*, *supra*, 4 Cal.App.4th at p. 1564, italics added.) Moreover, ostensible authority cannot be based solely upon the conduct of the Tax Collector in this matter. (*Taylor*, *supra*, 138 Cal.App.4th at p. 1005.)

As our case law indicates, the onus was on plaintiffs to confirm the extent and limits of the Tax Collector's authority. There is no evidence that plaintiffs were in any way precluded from doing so. As a result, plaintiffs could not establish the justifiable reliance prong necessary to an ostensible authority argument. (See *Taylor*, *supra*, 138 Cal.App.4th at p. 1005.) However, even if we were to assume for purposes of argument that the elements of estoppel were satisfied, we are of the opinion plaintiffs may not assert estoppel in this matter for reasons discussed below.

First, case law provides that "principles of estoppel may not be invoked to directly contravene statutory limitations." (*Medina v. Board of Retirement* (2003) 112 Cal.App.4th 864, 869.) Were we to affirm the judgment on the basis of an estoppel we would be directly contravening the statutory limitations set by Government Code section 23005. This alone appears a sufficient basis upon which to reject the theory. However, there are additional reasons against applying the doctrine of estoppel in this case.

"Estoppel against the government may be applied 'only in the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow.' " (*Clary v. City of Crescent City* (2017) 11 Cal.App.5th 274, 285.) "At common law, estoppel was unavailable against the government. We have long held, however, that estoppel may be asserted against the government 'where justice and right require it' [citation], and we have applied the doctrine against government entities in a variety of contexts. At the same time, our cases recognize the correlative principle that estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public.' [Citation.] In [*City of Long Beach v.*] *Mansell* [(1970)] 3 Cal.3d 462, we adopted a balancing approach to accommodate these concerns: 'The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel.' " (*Lentz*, *supra*, 49 Cal.3d at pp. 399–400, fns. omitted.) Assuming, for purposes of argument, that "justice and right" militate in favor of applying estoppel against the County, we now consider the public policy implications of applying the doctrine.

In *Lentz*, the issue was "whether, in an administrative hearing in which the government seeks recoupment from a welfare recipient for overpayments, the recipient may assert equitable estoppel as a defense." (*Lentz*, *supra*, 49 Cal.3d at p. 396.) In analyzing the issue, the high court drew a distinction between the application of estoppel when purely procedural policy considerations are impacted as opposed to substantive policy considerations. (*Id*. at pp. 400–402.) The *Lentz* court wrote, "estoppel against a welfare agency may be appropriate when … a government agent has negligently or intentionally caused a claimant to fail to comply with a *procedural* precondition to eligibility, and the failure to invoke estoppel would cause great hardship to the claimant.

A more difficult question is posed, however, when estoppel is asserted against the government to defeat *substantive* limitations on eligibility for public benefits. To bar recoupment of benefits from a person whose circumstances did not qualify him for such benefits under applicable substantive eligibility rules might amount to a bestowal of benefits not contemplated by the Legislature. In this regard, we share the United States Supreme Court's view that it is ' " the duty of all courts to observe the conditions defined by [the legislative branch] for charging the public treasury." ' " (*Lentz*, *supra*, 49 Cal.3d at pp. 401–402, quoting *Schweiker v. Hansen* (1981) 450 U.S. 785, 788, fn. omitted.)

Here, the Legislature did not intend for a county to have liability exposure in connection with a tax sale. To the contrary, it enacted statutory protections designed to either preclude such liability exposure or, alternatively, to allow such exposure only when the duly authorized decision-makers for a county considered and approved such exposure. One obvious purpose of subdivision (a) of section 3692.3 (i.e., all tax sales are offered and sold as is), and subdivision (b)(1) of said statute (i.e., municipality conducting sale has no liability for known or unknown condition of property), is to protect the public fisc. In addition, Government Code section 23005 (prescribing the modes by which a county may act), and the principle that the mode is the measure of power, are likewise protective of the public fisc by ensuring that only duly authorized actions have the effect of binding a county.

Were we to hold in this matter that County is liable for the Tax Collector's unauthorized acts under the facts of this case, we would be nullifying strong policies designed for the benefit of the public. We decline to do so.[13]

---

[13] We recognize our holding in this matter will cause hardship to plaintiffs. Yet, as was stated by our state high court: "It is urged in this case, as it invariably is in all such cases, that the application of this rule [i.e., the mode is the measure of power] works a great hardship …. But the provision of the law limiting the power of [a governmental entity] to validly contract, except in a prescribed mode, proceeds from a consideration of public policy … adopted as the policy of the state with reference to inferior boards and

## DISPOSITION

We reverse the judgment and direct the trial court to enter judgment in County's favor on plaintiffs' first and third causes of action for breach of contract and declaratory relief, respectively.  In light of this reversal, we remand the matter to the court to address plaintiffs' second cause of action for declaratory relief and for further proceedings not inconsistent with this opinion.[14]  In the interests of justice, each party shall bear its own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)[15]

LEVY, Acting P. J.

WE CONCUR:

FRANSON, J.

SMITH, J.

---

public bodies, and it would be difficult to perceive what practical public benefit or result could accrue by legislative limitation or prohibition on the power of such bodies to contract if courts were to allow a recovery where the limitation or prohibition is disregarded." (*Reams*, *supra*, 171 Cal. at p. 157.)

[14]     Plaintiffs have a separate appeal pending before this court in case No. F087969 in connection with this litigation.  We request the parties inform this court in case No. F087969 as to the effect of this opinion on that appeal.

[15]     In light of our disposition, it is unnecessary to consider County's remaining arguments on appeal.